THE STATE *ex rel.* ST. LOUIS UNDERGROUND SERVICE COMPANY v. MURPHY, *Street Commissioner.*

In Banc, June 2, 1896.

ON DEMURRER TO RETURN.

1. **Municipal Corporation:** ST. LOUIS: STREETS: ELECTRIC WIRES. The city of St. Louis may authorize, and if the public safety and general welfare demand it, can require all electric wires used for the public benefit to be placed under the surface of its streets.

2. ———: ———: ———: ———: SUBWAYS. Under the charter of said city vesting it with power "to regulate" the use of its streets, an ordinance which grants a private corporation the right to occupy the streets by subways and equipments necessary to conduct electricity without requiring them to be used for the benefit of the public, and without reserving any right of control over the works or business of said company, except in the mere approval of the plans it may adopt for making the subways and the manner of executing the work, is for private purposes and is, therefore, *ultra vires* and void.

3. ———: CONTRACT: ESTOPPEL. The doctrine of estoppel can not be invoked to render valid a contract entered into by a city which it is not authorized to make.

ON FINAL HEARING.

4. **Municipal Corporation**: PUBLIC STREETS. A municipal corporation has no power to divert its public streets from the uses to which they were dedicated.

5. ———: PUBLIC STREETS, REGULATION OF USE OF: SUBWAYS. It can not grant their use for subways to another, though his sole purpose may be that of leasing them to public wire-using corporations, without reserving the power of control over their construction, maintenance and use.

6. ———: ———: ———. Where, under power from the state to place its wires under the streets of a city with the consent of the latter, a telegraph or other similar corporation secures such right, no power of regulation is reserved to the city except such as is incidental to the regulation of the use of the streets, and such as the safety and welfare of the public demand; other rights must be secured by contract as conditions of the grant.

7. ———: ———: ———: CITY OF ST. LOUIS. The city of St. Louis has no power to grant the privilege of constructing electrical subways under the surface of its streets for the private gain of its grantee, though intended to be leased to others for public use, as it would be in effect a delegation of its powers over its public streets to others to be exercised for their own profit.

## Mandamus.

PEREMPTORY WRIT DENIED.

*John G. Chandler, Robt. L. McLaran,* and *E. A. Noonan* for relator.

(1) The return is false in fact, known to respondent to be false, was not authorized by him, or made under any instructions from him, and is a contempt of this court. *State v. Railroad,* 41 N. J. L. 250; Bac. Abr., Mandamus; Merrill on Mandamus, sec. 282. (2) The traverses in the return are not positive averments of fact, but allegations on information, or vague and undefined denials, which nowise show a right to refuse obedience to the alternative writ. High on Ex. Rem., secs. 460, 464, 469, 479, 481; *State v. Lean,* 9 Miss. 279; *Levi v. English,* 4 Ark. 65; *Springfield v. County Commis-*

*sioners*, 10 Pick. 59; *People v. Morton*, 12 Abb. Pr. (N. S.) 47; *State v. Sumter Co.*, 22 Fla. 1; *People v. American Inst.*, 2 N. Y. Leg. Obs. 170; *King v. Bank Com'rs*, 3 Ad. & El. 540.    (3)  All that part of the return demurred to is but exception in matter of law to the alternative writ, and at most a mere demurrer thereto. High on Ex. Rem., sec. 492; *People v. Salmon*, 46 Ill. 336; *People v. Miner*, 46 Ill. 387.  (4)  Notwithstanding the insufficiency of the pleading, every allegation of fact in the return has been proven false, and every averment of the writ shown to be true.   See evidence.  (5) The respondent and the city of St. Louis are estopped from denying relator's title and right under ordinances 14798 and 15953 to the remedy herein sought. *Railroad v. Marion Co.*, 36 Mo. 294; *Barrett v. Schuyler Co.*, 44 Mo. 197; *Union Depot Co. v. St. Louis*, 76 Mo. 293; *Green v. Railroad*, 82 Mo. 653; *Pendleton v. Amy*, 13 Wall. (U. S.) 297; *Swain v. Seaman*, 9 Wall. (U. S.) 254; *County, etc., v. Am. Em. Co.*, 93 U. S. 124; *Moore v. Mayor*, 73 N. Y. 238; 29 Am. Rep. 135; Green's Brice's Ultra Vires [1 Am. Ed.], 41, 42; *Taylor v. Railroad*, 4 H. of L. Cas. 628; *Railroad v. Hawkes*, 5 H. of L. Cas. 381; *State ex rel. v. L. G. L. Co.*, 102 Mo. 472; *Broadwell v. Merritt*, 87 Mo. 95.   (6)  Unless the ordinances in question are prohibited by the charter of the city, or the law of the state, they are valid. Charter, art. 3, sec. 26, clause 14; 2 R. S. 1889, p. 2100; Green's Brice's Ultra Vires [1 Am. Ed.], 41, 42; *Taylor v. Railroad*, 4 H. of L. Cas. 628; *Railroad v. Hawkes*, 5 H. of L. Cas. 381.   (7)  The city had full power to enact the ordinances in question.   Charter, art. 3, sec. 26, clauses 2, 5, 14; R. S. 1889, pp. 2096, 2097, 2100; Charter, art. 6, secs. 2, 4, 5; R. S. 1889, pp. 2119, 2120; Scheme, sec. 10; R. S. 1889, p. 2078; Const. of Mo. 1875, art. 9, secs. 20, 21; *St. Louis v. West. U. T. Co.*, 149 U. S. 465; *State v. Clarke*, 54 Mo.

17; *Gibbons v. Ogden*, 9 Wheat. (U. S.) 1, 197. (8) For the purposes involved in this case, relator is a public corporation; the use of the streets for conduits to be occupied by wire-using companies generally, is a public use, and not a private use, notwithstanding relator may charge and receive tolls or rent for the use of the ducts. *Knapp, Stout & Co. Company v. Railroad*, 126 Mo. 26; *Belcher Sug. R. Co: v. El. Co.*, 101 Mo. 192; *Johnston's Appeal*, 17 Atl. Rep. (Pa.) 167; Lewis, Em. Dom., sec. 172. (9) The title of ordinance 14798, "To Provide for the Laying of Electric Wires Underground," shows its public character and purpose. *Darst v. Bagley*, 110 Mo. 53. (10) It is no objection to the ordinance that it delegates the power to build subways, to relator. *McCartney v. Railroad*, 112 Ill. 611; *Le Clair v. Davenport*, 13 Iowa, 310; *Belcher Sug. Ref. Co. v. El. Co.*, 101 Mo. 192. (11) By enacting these ordinances the city in no way parted with its control over the streets or the structures to be built therein. *Railroad v. Springfield*, 85 Mo. 674; *Belcher Sug. Ref. Co. v. El. Co.*, 101 Mo. 192; *LeClair v. Davenport*, 13 Iowa, 310; *Munn v. Ill.*, 94 U. S. 113; *King v. Mayor*, Doug. 149. (12) The title of ordinance 15953 is sufficient. *St. Louis v. Tifel*, 42 Mo. 578, 590; *St. Louis v. Green*, 7 Mo. App. 468; 70 Mo. 562. (13) The corporate powers of the relator, or of its assignors, can not be inquired into in this proceeding. *Broadwell v. Merritt*, 87 Mo. 95; *Shewalter v. Pirner*, 55 Mo. 218.

*D. D. Fisher* and *Edward C. Kehr* for respondent.

(1) The charter directs that "no bill shall contain more than one subject, which shall be clearly expressed in its title." Sec. 13, art. 3. This is the precise phraseology of section 28, article 4, of the constitution

of Missouri, and must receive the same construction. The title does not express or indicate the subject of either ordinance, and they are therefore void. *City of Kansas v. Payne*, 71 Mo. 159; *Bergman v. Railroad*, 88 Mo. 678. (2) A municipal corporation possesses, and can exercise only such powers as are conferred by its charter. All acts beyond the scope of the powers granted are void. Under the present charter the city has no power to lay conduits and pipes for the transmission of electricity, and, therefore, no power to grant to others a franchise to use the streets for that purpose. 1 Dillon on Mun. Corp. [4 Ed.], sec. 89; Charter of St. Louis, art. 3, sec. 26; R. S. 1889, pp. 2085-2100; *Spaulding v. Peabody*, 153 Mass. 129. (3) If the power is claimed to exist, it can only be derived from the power of the city to regulate the use of its streets. But a street can be devoted only to public use, and an ordinance which diverts it to private use, or curtails the right of the city to control it at all times, for public use, is *ultra vires* and void. Dillon on Mun. Corp., secs. 97 and 656, also, secs. 383, 716; *Belcher Sugar R. Co. v. Elevator Co.*, 82 Mo. 121; *Belcher Sugar R. Co. v. Elevator Co.*, 101 Mo. 192; *Glaessner v. Ass'n*, 100 Mo. 508; *Schopp v. St. Louis*, 117 Mo. 131; *Glasgow v. St. Louis*, 87 Mo. 678; *Cummings v. St. Louis*, 90 Mo. 259; *Matthews v. Alexandria*, 68 Mo. 115; *Railroad v. St. Louis*, 2 Dillon, C. C. R. 70. (4) The franchises granted by the ordinances in question are not for a public use, but for the private use, gain and emolument of the subway company, its successors or assigns, and such franchises so granted are utterly void. *Lowell v. Boston,* 111 Mass. 454; *Opinion of the Justices*, 150 Mass. 592; *Belcher Sugar R. Co. v. Elevator Co.*, 82 Mo. 121; *Savannah v. Hancock*, 91 Mo. 54; *City of Kansas v. Baird*, 98 Mo. 215; *Co. Ct. of St. L. Co. v. Griswold*, 58 Mo. 175. (5) The ordinance is an irrevoca-

ble grant for fifty years of so much of the public streets, alleys and highways of the city, as the conduits, pipes, and manholes of the subway company may occupy, without the reservation of power on the part of the city, either: *First*, to repeal the ordinance; or, *second*, to resume possession of the space occupied by said conduits, pipes, and manholes, or to remove them or change their location; or, *third*, to secure said conduits, pipes, etc., or the space they occupy, for public use; or, *fourth*, to fix or regulate the price or charges for their use; or, *fifth*, to supervise or control such use; or, *sixth*, to prevent the assignment or transfer of such use to private purposes. Such grant is void, because if valid, it will deprive the city of the control and regulation of its streets, and prevent it from discharging its public duties. Dillon on Mun. Corp., sec. 716; cases above cited under point 3, and, *City v. Bell Telephone Co.*, 96 Mo. 623. (6) The sole purpose for which the conduits are constructed and used by the subway company, is to rent or lease them to others for its private gain and emolument, and upon its own terms. The city is not authorized to rent or lease any portion of its streets for private use, and hence can not confer any such right on the subway company. *Glasgow v. City*, 87 Mo. 678; *Schopp v. City*, 117 Mo. 131; *Glaessner v. Ass'n*, 100 Mo. 508. (7) The ordinance does not prescribe the size, dimensions, kind, or character of the structure which it authorizes the subway company to place and maintain in the streets, alleys, and public highways of the city, nor the plan of such structure, nor the route or routes to be followed, nor does it specify or limit the number of conduits and pipes which the company may lay, nor does it prescribe the dimensions or location of the space in the streets to be occupied by the conduits, pipes, and manholes of the company, but delegates the legislative power, judgment,

and discretion of the municipal assembly upon these subjects to the board of public improvements. Hence the ordinance is void. 1 Dillon, Mun. Corp. [4 Ed.], sec. 96; *Ruggles v. Collier*, 43 Mo. 353; *St. Louis v. Clemens*, 43 Mo. 395; *St. Louis v. Clemens*, 52 Mo. 133. (8) Where the act undertaken is *ultra vires* of the corporation, there can be no estoppel. Power can not be created by estoppel. Bigelow on Estoppel [5 Ed.], pp. 466, 467, also p. 349; Cababe on Estoppel, 125, 126; *Scoville v. Thayer*, 105 U. S. 143; *Winters v. Armstrong*, 37 Fed. Rep. 508. The ordinance being executory as to the portion of the term yet to come, it is not only the right, but the duty, of the city to disaffirm and abandon it. *Thomas v. Railroad*, 101 U. S. 71; *Penn. Co. v. Railroad*, 118 U. S. 290; *Railroad v. Railroad*, 130 U. S. 1–37; *Mallory v. Oil Works*, 86 Tenn. (2 Pickle), 598; *St. Louis v. Davidson*, 102 Mo. 149; *Dairy Co. v. Mooney*, 41 Mo. App. 665. (9) The relator has not acquired title to the franchise in question, nor has it legal capacity to assume or perform public duties under it. *Central Trans. Co. v. Pullman Car Co.*, 139 U. S. 24; 1 R. S. 1889, secs. 4915, 4918; *McPheeters v. Bridge Co.*, 28 Mo. 465; *Stewart v. Jones*, 40 Mo. 140.

DIVISION ONE.

MACFARLANE, J.—On the fifteenth day of February, 1889, an ordinance of the city of St. Louis, number 14798, entitled, "An ordinance to provide for laying electric wires underground," was passed and approved.

By section 1 permission and authority was granted the National Subway Company, of Missouri, its successors and assigns, to construct, maintain, and operate conduits, pipes, mains, conductors, manholes, and service and supply pipes in any of the streets,

alleys, squares, avenues, and public highways, of the city of St. Louis, for the term of thirty-five consecutive years.   The objects are declared to be those of "distributing and maintaining a line or lines of electric and other wires, together with all necessary feeders, outlets, service wires, or other electrical conductors to be used for the transmission of electricity for any and all purposes."

It was further provided, that "before said company, its successors, or assigns should lay any conduits or pipes in any of the streets it should submit to the board of public improvements its plans and the same should be approved.

Section 2 prescribed the manner and depth in which conduits and pipes should be laid in the streets.

Section 3 required the work to be done with the least possible injury or delay to the public, and that the streets be left in proper condition.

Section 4 required the deposit of $1,000, to secure the proper repair of streets and imposed a penalty for neglect to repair.

Section 5.   The corporation is declared to be a common carrier, and is required to permit any person or persons, company or companies, to use said system of underground conduits upon terms agreed upon by the respective parties, and in case of a failure to agree, arbitration was provided for.

Section 6 requires the corporation to furnish, in addition to other taxes assessed by law, and maintain at its own expense, all the wires of the fire and police alarm and telephone service of the city of St. Louis, free of charge to the city.

Section 7 makes the corporation subject to ordinances of the city now in force, or that may hereafter be passed in relation to making excavations in streets.

Section 8 nullified the ordinance unless a bond for $25,000 with approved security should be filed in ninety days, conditioned for the faithful observance of the ordinances. The ordinance was also made null, unless work was commenced in sixty days.

Section 9 declares a forfeiture for violation of the conditions and provisions of the ordinance.

Section 10 gives the city the right to purchase the property at the end of the term granted.

On February 6, 1891, ordinance number 15953 was passed, entitled, "An ordinance amendatory of ordinance number 14798 of the city of St. Louis entitled: 'An ordinance to provide for the laying of electric wires underground.'" This ordinance strikes out sections 6 and 10 of ordinance 14798 and substitutes for sections 1, 4 and 5, three other sections.

The only material change made by section 1 is to extend the duration of the franchises to fifty years and to grant the right to distribute and maintain "electric, telegraph, telephone, and other wires." No material change was made to section 4.

Section 5 as amended, besides declaring said company, its successors and assigns, a common carrier, requires a payment to the city for the rights and franchises granted, semiannually in advance, the sum of $500. No provision is left for the use of wires by the city, or the right of any other company or person to use them.

Said National Subway Company was incorporated January 28, 1889, under the act providing for the incorporation of telegraph and telephone companies, now article 5, chapter 42, Revised Statutes, 1889, with a capital stock of $250,000 divided into twenty-five thousand shares of $10 each. The purposes of the incorporation as declared in the articles of association are to construct, own, operate, and maintain a line of

underground magnetic telegraph in the city of St. Louis.

On the fifth of February, 1889, the board of directors sold and assigned all the rights and franchises granted by said ordinance to Charles Sutter for the consideration of $100.

On the twenty-fifth of February, 1889, the St. Louis Subway Company was incorporated under article 8, chapter 21, Revised Statutes of 1879, as a private business corporation with a capital stock of $500,000 divided into fifty thousand shares of $10 each, which was alleged to have been actually paid up in lawful money of the United States. Of this stock the said Charles Sutter subscribed for forty-nine thousand, eight hundred shares.

The purposes of this corporation as declared in the articles were: "To lay out and maintain, construct, and operate lines of subway in this state for the purpose of carrying wires for the transmission of electricity and electric currents, and in and about said business to acquire and hold such property, both real and personal, as may be requisite and necessary in the premises; to make all necessary leases, contracts, and other agreements as may be required to carry out the purposes of the company."

On February 28, 1889, this corporation was organized, and purchased from Charles Sutter the rights and franchises granted under said ordinances, for which it agreed to pay $498,000. Mr. Sutter accepted forty-nine thousand, eight hundred shares of fully paid up stock in satisfaction of the purchase price. The other shareholders, except one who subscribed for twenty-five shares, paid for their stock by services rendered.

From June, 1889, to the end of that year, the St. Louis Subway Company obtained permits upon plans approved by the board of public improvements and

caused a line of subways to be constructed, about one and one sixth miles in length, as follows: On Broadway, from Elm street to St. Charles; on Market street, from Broadway to Tenth; on Tenth street, from Market to Chestnut; and on Chestnut street, from Tenth to Fourteenth street.

The subways occupy a space in the streets about six feet deep and three feet wide, with manholes about five to six feet in diameter at each street crossing, and at other points where obstructions are to be passed.

From 1889 to 1894 nothing was done in the way of building conduits. On the tenth day of May, 1890, John B. O'Mera obtained judgment against the St. Louis Subway Company in the St. Louis circuit court for $8,869.23, for work done on the subways above mentioned, and on the tenth day of June, 1890, Emile A. Meysenburg obtained a judgment against it in the same court for $42,911.22, on account of work, material, and money applied to the construction of said subways. Upon these judgments executions were issued and the sheriff seized all the right, title, and interest of the St. Louis Subway Company in and to the franchises acquired by it under the ordinance 14798, and all its title in and to the subways above mentioned, and all pipes, mains, iron, etc., belonging to said company, and on July 21, 1890, sold the same to Emile A. Meysenburg for the sum of $1,000, to whom the sheriff executed a deed as for the sale of real estate.

Alias executions were issued on said judgments, and the same property seized and sold under them as personal property on January 7, 1891, at which sale Emile A. Meysenburg was again the purchaser at the sum of $500, and for which he received a bill of sale from the sheriff.

The relator, the St. Louis Underground Service Company, was incorporated February 26, 1891, as a

private business corporation, under article 8, chapter 42, Revised Statutes of 1889, with a named capital stock of $1,000,000, divided into ten thousand shares of $100 each, which is alleged to have been fully paid in lawful money. The stock was subscribed as follows: Emile A. Meysenburg, nine thousand shares; Robert McLaran, two hundred and fifty; Benjamin Von Phul, two hundred and fifty; Andrew J. Cooper, two hundred and fifty, and Chas. Sutter two hundred and fifty shares.

The purposes for which this company was organized "are to lay out and maintain, construct and operate lines of subway in this state for the purpose of carrying wires for the transmission of electricity and electric currents; also to lay out, construct, and maintain and operate lines of pipes, mains, and conductors in this state for the purpose of distributing substances, either for fuel or illuminating purposes, or for both, and for said purposes to acquire and hold such property, both real and personal, as may be requisite and necessary in the premises, to make all necessary leases, contracts, and other agreements as may be required to carry out the purposes of the company.

Emile A. Meysenburg, on March 10, 1891, for the expressed consideration of $900,000, by bill of sale transferred to the St. Louis Underground Service Company all the property and rights he acquired by purchase at the sheriff's sales above mentioned. By this transfer he paid his subscription for the nine thousand shares of stock subscribed by him. From this time, March 10, 1891, until the summer of 1894, the St. Louis Underground Service Company did nothing in the way of building conduits.

In May, 1894, relator made application for and received a permit to, and laid a subway one hundred and eighty feet in length on Olive street from Broadway

east to an alley at the middle of the block, and south on said alley to a point opposite the operating room of the Postal Telegraph Company, in the Laclede building. And on August 20, it obtained a permit and constructed a subway about one hundred and sixty-five feet in length on Fourteenth street, from Chestnut to the alley in the middle of the block, and about sixteen feet into the alley.

In November, 1894, relator made application in due form to respondent, as street commissioner, for permit to construct conduits on Chestnut street. The plans had previously been submitted to and approved by the board of public improvement. Respondent refused to grant the permit. This proceeding is by *mandamus* to require respondent, as street commissioner, to grant the permit. A writ was issued and respondent has made return thereto, to which relator demurred. From the pleadings and the evidence taken the foregoing facts are deduced.

While the legal questions involved are raised by demurrer to the return, the entire case was presented by oral argument and brief of counsel; we will consider the merits of the case without regard to the form in which it has been presented.

I. A number of questions were discussed by counsel, both in argument and brief, but the most important, and, as we think, the controlling one is whether the city of St. Louis had the power to grant to the National Subway Company the franchises now claimed by relator. If it had no such power and is not estopped by what it has done in affirmance of its grant, the controversy necessarily ends, and consideration of other questions will be unnecessary.

Municipal as well as other corporations derive their power from the legislature and can exercise none not confided to them. To the charter of the city of St.

Louis, then, we must look for authority to make the contract in question. *State v. Clarke*, 54 Mo. 35.

The charter undoubtedly vests in the city large power and control over the streets and other public property within its limits. It has power to establish, open, and vacate all streets, public grounds and squares, and regulate the use thereof; to lease portions of the unimproved wharf; to license, tax, and regulate telegraph companies, and street railroad cars; to have. sole power and authority to grant to persons or corporations the right to construct railways in the city, and, finally, to pass all such ordinances, not inconsistent with the provisions of the charter, or the laws of the state, as may be expedient, in maintaining the peace, good government, health, and welfare of the city, its trade, commerce and manufactures. Charter, R. S. 1889, pp. 2085 and 2100.

The power to regulate the use of streets is very comprehensive. "The word 'regulate' is one of broad import. It is the word used in the federal constitution to define the power of congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be." Mr. Justice Brewer in *St. Louis v. W. U. Tel. Co.*, 149 U. S. 469.

Under the power thus delegated it can not now be questioned that the municipal authorities can permit the use of the surface of the streets for the erection of telegraph and telephone poles, and the laying of railroad tracks; the space above the surface for stringing electric wires for the transmission of messages and the creation of light, and may also permit the laying of water and gas pipes, and sewers, beneath the surface. *Julia Building Ass'n v. Bell Tel. Co.*, 88 Mo. 258; *St. Louis v. Bell Tel. Co.*, 96 Mo. 629; *Ferrenbach v. Turner*, 86 Mo. 416; *Schopp v. St. Louis*, 117 Mo. 136.

These uses are all of a public nature, and are not inconsistent with the public uses to which the streets were dedicated.    Under its general power to regulate the use of streets the city has authority to authorize corporations and persons, for the purpose of serving the public, to string telegraph, telephone, or electric light wires, upon poles above the surface, or through conduits beneath the surface of the streets, provided, such structures and mechanical appliances do not materially interfere with the ordinary uses of the streets and public travel thereon.

But the city has no power under this, or any other provision of its charter, to authorize such a use of the streets, though for a public purpose, as will destroy its usefulness as a public thoroughfare.  *Lockwood v. Railroad*, 122 Mo. 86; *Knapp & Co. v. Railroad*, 126 Mo. 26, and cases cited.

So it is well settled that the city of St. Louis has no power to authorize the appropriation of any parts of its streets for private purposes.    The power to regulate the use of streets refers to legitimate public uses not inconsistent with the ordinary and paramount use for travel thereon, or with the private rights of abutting property owners.    An ordinance having the effect of diverting the streets from a public to a private use, or of unreasonably appropriating them to a public use other than that of ordinary travel by pedestrians and vehicles is *ultra vires* and void.    *Knapp & Co. v. Railroad, supra; Dubach v. Railroad*, 89 Mo. 488; *Belcher, etc., Co. v. Elevator Co.*, 82 Mo. 124; *Schopp v. St. Louis, supra; Glaessner v. Brewing Ass'n*, 100 Mo. 508.

It is true that these decisions and the principle declared were applied to grants authorizing the use of the surface of the streets.    But the public use of streets, as has been said, is not confined to the surface, nor is

the power of the city confined to that of regulating the use of streets and public grounds. To it is also delegated general police powers and under them it is authorized to pass "all such ordinances as may be expedient in maintaining the peace, good government, health, and welfare of the city, its trade, commerce, and manufactures." In the exercise of the powers thus delegated it has the undoubted right to regulate the public use of the streets both above and beneath the surface. This it constantly does by allowing public sewers, water mains and gas pipes to be laid beneath the surface, and regulating the manner in which the work shall be done.

It is said in a recent case: "This power to regulate the use of streets is not confined to the regulation of travel thereon, but under it the city may allow gas, water, and sewer pipes to be laid therein and may cause wells therein to be filled * * * and may permit the erection and maintenance of telephone poles thereon. * * * All these uses are consistent with the uses for which streets are acquired or dedicated." *Schopp v. St. Louis*, 117 Mo. 136. The dedication of the streets, then, to public uses, includes as well the soil beneath them as the surface itself. The city authorities had the same power to regulate the use of the streets beneath as upon the surface thereof, and the power is in like manner limited to public uses.

It has also been held that the general power to regulate the use of streets is not confined to public uses common and known at the time of the dedication, but extends to new uses as they spring into existence. *St. Louis v. Bell Tel. Co., supra.*

Under these well settled principles there can be no doubt that the municipal authorities of the city of St. Louis, vested as they are with such enlarged control over property devoted to public uses, has the power to

authorize, and if public safety and general welfare demands it, to require all electric wires, used for the benefit of the public, to be laid under ground. This would be a proper and legitimate regulation of the public use of the streets. But the streets of a city are dedicated to public uses only and are held by the municipality in trust for such uses. The trust is sacred and the city has no authority even under such enlarged powers as St. Louis possesses, to permanently divert any portion of it from these uses, to such as are purely private.

The question then is whether, under the ordinance granting to the National Subway Company of Missouri, its successors or assigns, the right to construct, maintain and operate conduits, pipes, mains, conductors, manholes, and service, and supply pipes in any of the streets, alleys, etc., of the city of St. Louis, during the term of fifty years, was for a public or private use. If for the latter, it must be held *ultra vires* and void.

While under the pleadings the issues were made by demurrer to the return, evidence was taken by the parties and filed, and the case was argued as well upon the evidence as upon the allegations of the pleadings, we consider the question as presented under the pleadings and the evidence. "If it is doubtful or questionable whether the use is public or not, testimony is admissible to determine the fact."

The purpose of the grant, as declared in the ordinance, is that of "distributing and maintaining a line or lines of electric, telegraph, telephone and other wires * * * to be used for the transmission of electricity for any and all purposes." By section 5, as amended, it is declared that such corporation (its successors or assigns) shall be a common carrier and shall have and enjoy such rights, privileges and immunities as are usually had and enjoyed by such companies."

These are the only purposes expressed in the ordinance.

A clause of section 5 in the original ordinance, which was omitted from the amendment, provided that said corporation shall permit "any persons, company, or companies, to use said system of underground conduits," upon terms to be fixed as therein provided.

There is nothing in the terms of the ordinance from which an inference can be drawn that the proposed conduit and wires should be used for the benefit of the public. The corporation was not at the time engaged in the business of transmitting messages by use of electric wires, or of transmitting electricity for the purpose of producing light, and no inference can be drawn that the proposed transmission of electricity was for use of the public. After the amendment of section 5 of the original ordinance no obligation was left on said corporation to serve the public in any capacity.

The corporation to which the franchises were granted was chartered under the general laws of the state for the purpose of constructing, owning, operating, and maintaining a line of underground magnetic telegraph in the city of St. Louis, but immediately on obtaining the franchises conferred by the ordinance it sold and assigned them to relator, into whose hands they are claimed to have passed by assignment. Relator was not even organized as a telegraph company. It was organized as a business corporation. Its purposes, as declared in its articles of association, are "to lay out and maintain, construct, and operate lines of subway in this state for the purpose of carrying wires for the transmission of electricity and electric currents; also to lay out, construct, and maintain and operate lines of pipes, mains, and conductors in this state for the purpose of distributing substances, either for fuel or illuminating purposes, or for both."

So it appears that relator does not, under its charter, undertake to discharge a public duty by itself using the wires for telegraph or telephone purposes. Its purpose, so far as appears from the ordinance or charter, is to occupy the streets by subways and electric wires. It is placed under no obligations to use them, or cause them to be used, for the benefit of the public. Still it claims the right to so occupy every street in the city for fifty years. No duty whatever is imposed upon it, no control over its works or business is retained by the city, except in the mere approval of the plans it may adopt for making the subways and the manner of executing the work.

The evidence shows that the object to be accomplished in granting these important franchises was to vest in one company the right to build suitable conduits and to require all telegraph, telephone, and electric light companies to lease and use the wires of the favored company, its successors or assigns.

We do not think it necessary to inquire whether a contract of this character, had the objects been expressed, could be upheld. Such purposes were not expressed; on the contrary, the provision in section 5 of the original ordinance which did give "any person or persons, company or companies" the right to use the system of underground conduits, was studiously omitted from the amended ordinance. As the ordinance now stands relator is under no obligation to permit any telegraph, telephone, or electric light company, to use its wires, and it is thus given the power to control the use of the streets for its own private benefit.

We think the extraordinary rights, powers, and franchises granted under the ordinances can only be construed to have been intended for the private use of

said corporation and that the city, therefore, had no power to grant them.

Much stress is laid upon the fact that the National Subway Company is declared under the ordinance to be a common carrier. But calling it a common carrier does not make it one. It has none of the characteristics of a common carrier. To ascertain how its franchises are to be used we must look to the rights conferred and the duties imposed under its charter and the ordinance. Does it appear from these that relator invites employment from the public generally? Does it obligate itself to serve the public generally? Is it subject to regulation and control in respect to its dealings with the public? None of these essentials to a public business, such as that of a carrier, appear. On the contrary, it is clear, as has been shown, that a private business only is contemplated.

II. But it is insisted that inasmuch as relator and its assignors have gone to large expense, with the knowledge of the city, in constructing subways in some of the streets, and have paid to the city semi-annually, in advance, the sum of $500 for the rights and franchises granted it, as required by section 5 of the amended ordinance, the city should now be estopped to deny the validity of the ordinance.

There is no doubt that the doctrine of estoppel is, as a general rule, alike applicable to corporations and individuals. It can not, however, be applied to validate a contract which the corporation had no power to make. The doctrine is thus declared: "Where a municipal corporation enters into a contract, *which it has the power to make*, the doctrine of estoppel applies to it with the same force as to individuals." *Union Depot Co. v. St. Louis*, 76 Mo. 393.

The rule is thus given by Bigelow: "If the act undertaken was in and of itself *ultra vires* of the cor-

poration, no act of the body can have the effect to estop it to allege its want of power to do what was undertaken. Bigelow on Estoppel [5 Ed.], pp. 466, 467. See, also, *Scovill v. Thayer*, 105 U. S. 143; *Thomas v. Railroad*, 101 U. S. 86; *Penn. R. R. Co. v. Railroad*, 118 U. S. 317.

In the case last cited it is said: "We know of no well considered case where a corporation, which is party to, a continuing contract which it had no power to make, seeks to retract and refuses to proceed further, can be compelled to do so."

As the city had no power to authorize the use of its streets for private purposes by ordinance, it certainly can not do so by estoppel.

Peremptory writ denied. BRACE, C. J., and ROBINSON, J., concur. ·BARCLAY, J., concurs in the result.

MACFARLANE, J.—This is an original proceeding by *mandamus*, the purpose of which is to require respondent Murphy, as street commissioner of the city of St. Louis, to grant relator a permit to construct conduits beneath the surface of Chestnut street in pursuance of contracts claimed to have been made with the city under ordinances.

The case was heard on a demurrer to respondent's return, and the demurrer was overruled. Relator, under a leave of court, has answered the return. Evidence was taken and the questions in issue have been argued and the case is now to be determined upon its merits.

A full statement of the pleadings will be found to accompany the former opinion. Most of the evidence was also then on file and was treated in the argument on the demurrer and in the opinion as forming a part of the record.

The answer of relator is, in substance, a denial of the allegation of the return.

The answer, by way of new matter, averred that its articles of association had been amended since the commencement of this proceeding, whereby its purposes are more distinctly set out as follows:

"This company is organized for the purposes of laying out, constructing, maintaining, and operating conduits or subways, pipes, mains, conductors, manholes, and service pipes in the streets, alleys or other public places in the cities of this state and elsewhere, to be used in distributing and maintaining a line or lines of electrical and other wires owned by this company or others, together with all necessary feeders and service wires and other electrical conductors and when used for the wires of others upon reasonable and just compensation; and to acquire and hold all necessary or useful grants, to occupy and use the streets, avenues, alleys, and other public places for the purposes aforesaid; to acquire and hold such property, real and personal, and incorporeal, as may be requisite and necessary in the premises; to make all necessary leases, contracts and other agreements as may be required to carry out the purposes of the company; to make proper by-laws, and to do and perform all such matters and things as may be necessary and usual for the effectual consummation of the purposes for which the company is formed."

The answer, also, for the purpose of showing the intention of the parties in making the contracts, and granting the franchises, evidenced by the ordinances, stated at length the situation in the city of St. Louis in respect to the manner in which electricity was then carried, the inconvenience and danger of such methods, and the necessity of providing for placing electric wires underground.

It charges that electric wires, for all the uses to which they are applied, are for the benefit of the public, as well as for the private gain of the owners, and that its subways "are intended and designed for the use of all persons upon reasonable rates and like conditions who may desire to use the same by placing wires therein or connecting with wires to be laid therein, and its property and employment are thereby affected with public use, and being so affected, whether its charter or the ordinances granting the right to construct and operate its works retains the reserved right to control and regulate the said conduits and the operation thereof or not. Such power, authority and control exists to the extent of protecting the public against danger, unjust discrimination, extortionate charges and injustice and oppression."

The new evidence introduced bore upon the character of the uses to which electric wires are applied for the purpose of showing that all such uses are public in their nature; the inconvenience and danger of overhead wires, and the necessity, convenience and economy of placing them underground, and in one subway.

I.    We are unable to perceive that the answer of relator, the amendment of its charter and the supplementary evidence now before us, have so changed the situation as to require a different conclusion from that reached upon the former hearing.

On that hearing it was held that the city, under its charter rights, has the power to control and regulate the public use of its streets and public grounds, not only upon, but if public safety requires it, above and beneath its surface, and, in the exercise of its general police powers, it may require all electric wires, whose use are of a public character, to be placed underground. But it was held further that the unconditional and uncontrolled grant contained in these ordinances, was

essentially for the private use of the grantee and its assigns to which the city had no power to devote its streets.

No claim was made on the first hearing, nor indeed can it be justly made now, that relator proposes to deal directly with the public. At most it only proposes for its own private gain to furnish others the instrumentalities by means of which they may subserve the public interest. Over the use, sale, assignment, or lease of these instrumentalities the city has expressly reserved no control or management. The business thus proposed can no more be denominated public than could that of manufacturing electric wires for the use of a telegraph company, or rails for use in the track of a railroad, or pipes for conducting water or gas through the streets. A single instrument, though a necessary part of a public work, is not a public instrumentality for the manufacture of which the power of eminent domain could be exercised even by the state. The use to which it may be applied is not the test of its public character. The use to which the entire work, and not parts of it, are to be applied, is the proper test.

The city of St. Louis made an unconditional lease of a portion of its public wharf to an elevator company to be used for erecting and maintaining a warehouse for the storing and handling of grain and other merchandise in connection with the use of its elevator. The power of the city to make the lease was questioned. This court held that while the city had power to lease its unused wharf for the purposes specified in the lease, it had no right to authorize the erection of such buildings thereon without reserving a control over the buildings and the uses to which they should be applied. *Belcher, etc., Co. v. Elevator Co.*, 82 Mo. 126.

The court in its opinion says: "The owner of the building may open or close it at his pleasure, and dis-

criminate between shippers and receivers of produce, and make his as strictly a private business, as if a retail dry goods merchant were permitted to erect a building on the wharf to conduct his business in.   There is no reservation by the city in the lease to defendant, of any control whatever of the building or business.''   The court says further:   ''The city has no right, and can acquire none from the legislature, to make such a disposition of the property condemned for wharf purposes, as will prevent her, in the event it becomes necessary to extend and pave the wharf, from doing its duty in that respect.''

The same may be said in respect to the property held in trust by the city for public streets.   The city has no power to divert their uses from those to which they were dedicated.   It had no right to grant their use to relator for subways, though its sole purpose may be that of leasing them to public wire-using corporations, without reserving the power of supervision and control, not only of the work of excavating in the streets, but of all matters incident to its location, construction, maintenance, and use.   No such powers have been reserved under these ordinances.

II.   It is now insisted that inasmuch as all the uses to which electric wires are ordinarily applied, are of a public character, and as the subways are to be used by corporations exercising public functions, they are for public, and not for private use, and the power of regulation and control is reserved in the municipal authorities.   In other words, that the uses to which the subways are to be applied, and not the ownership, determines their character, and if the use is public the streets may be devoted to their maintenance, and the power to regulate is reserved.

It may be conceded that the use of electric wires for the transmission of messages by telegraph and tele-

phone, and for the distribution of light throughout the city for the use of its inhabitants, is essentially public in its character, and to which the public streets may be properly devoted. Indeed, the correctness of this proposition has been frequently declared by this court, and is recognized by the legislation of this state. *State ex rel. Laclede Gaslight Co. v. Murphy*, 130 Mo. 10, and cases cited; R. S. 1889, secs. 2721 and 2792.

It may also be conceded that where the franchises granted by the government are for the purpose of subserving the public interests, power is reserved in the public to control the use for the common good unless restricted in the grant. As has been said, "the rights of the public are never presumed to be surrendered to a corporation, unless the intention to surrender clearly appears in the law." *Perrine v. Canal Co.*, 9 How. *loc. cit.* 192.

But it must be kept in mind that the city of St. Louis does not exercise original governmental functions, but only such measure thereof as the state has seen fit to delegate to it. Telegraph, telephone and electric light companies also receive their powers directly from the state. The reserved power to regulate them, unless within the delegated power of the city, rests in the state. These corporations are vested with power, under certain restrictions, to use the public streets of cities and to place their wires and other fixtures under ground on obtaining the consent of the municipal authorities thereof. R. S. 1889, secs. 2721 and 2793.

It is evident that the city has no such reserved power over these wire-using corporations as is possessed by the state. It can only exercise such powers as are granted in express terms; those necessarily or fairly implied in or incident to those expressly given; those essential to the declared objects of the corporation.

1 Dill. Munic. Corp., sec. 89; *St. Louis v. Bell Tel. Co.*, 96 Mo. 625.

The express powers bearing upon the rights here claimed are confined to general police powers and the power to regulate legitimate public uses of the streets. But the public corporations to which the relator proposes to lease the use of the streets and through which it proposes to serve the public has express power from the state to place its wires and other fixtures under ground in the streets of cities provided it obtain the consent of the municipal authorities thereof.

It is clear, therefore, that when a telegraph or other such corporation secures the right to lay its wires underground in the streets of the city, no power of regulation is reserved by the city except such as are incident to the regulation of the use of the streets and such as the safety and welfare of the public may demand. Any further rights must be secured by contract as conditions of the grant.

III. But conceding that the subways relator proposes to construct are, without other requirements or conditions than those expressed in the ordinances, of such a public character, and for such a public use as will authorize their construction in the public streets, and that the city has the power to confine their use to public purposes, we are still of the opinion that the ordinances are void for the reason that the city thereby undertakes to delegate powers which it alone can exercise under its charter.

The attempt is made under the ordinance to grant to the National Subway Company, and its assigns, the right to occupy space for its subway beneath the surface of every street in the city for the period of fifty years to the practical exclusion of all other public uses. It is given power to select its own patrons, and dictate its own terms. It can elect upon which streets

its works can be constructed. It can practically control the charges of all electric wire-using corporations. It has the practical control of the use of all public wires which may hereafter be required to go under ground. By the ordinances the city virtually surrenders to relator its power to regulate the underground use of its streets by wire-using companies and permits their use for such public purposes only as may appear most profitable to relator. The contract can only be characterized as an attempt on the part of the city to surrender and bargain away to relator its charter powers. This it could not do. "Powers are conferred upon municipal corporations for public purposes; and as their legislative powers can not    *    *    * be delegated, so they can not, without legislative authority, express or implied, be bargained or bartered away. Such corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties." 1 Dill. Mun. Corp., sec. 97; *Belcher, etc., Co. v. Elevator Co., supra; Matthews v. Alexandria*, 68 Mo. 119; 15 Am. and Eng. Encyclopedia of Law, 1045, and cas. cit.; *Goszler v. Georgetown*, 6 Wheat. 593; *Gale v. Kalamazoo*, 23 Mich. 344; *Waterbury v. Laredo*, 68 Tex. 565.

In the case cited, from 68 Mo., the city of Alexandria undertook to lease to Matthews its wharf which the city had power to regulate and control. In passing upon the validity of the contract the court says: "No authority was given by the charter to the city to lease the wharf, or farm out its revenues, or to empower any one else to fix the rates of wharfage. All these things were attempted to be done by the contract under consideration, and being wholly unauthorized,

the contract was illegal. and void. The legislative authority of the city could not be delegated, nor could the city abdicate its control over the public property held in trust by it for the benefit of the public.''

The evidence here shows and common knowledge advises us that economy of space, convenience to the public, security, and proper adjustment of conflicting interests of the various competing companies make it desirable if not necessary that all electric wires should be laid in one subway, but the city can not cede to another the power of supervision over them. That power can only be exercised by the city.

Writ denied. BRACE, C. J., and BARCLAY, J., concur. ROBINSON, J., dissents. /

### IN BANC.

PER CURIAM.—The foregoing opinion of MAC-FARLANE, J., handed down in division number one is adopted as the opinion of the court *in banc*. BRACE, C. J., and BARCLAY, GANTT, SHERWOOD, and BURGESS, JJ., concurring therein with MACFARLANE, J.; ROBIN-SON, J., dissenting. The writ of *mandamus* is, there-fore, denied.