THE STATE *ex rel.* NATIONAL SUBWAY COMPANY *et al.* v. ST. LOUIS *et al.*

In Banc, July 6, 1898.

1. **Mandamus**: PLEADING: MOTION TO STRIKE OUT. Where a petition in *mandamus* contains matter that is immaterial and redundant, a motion to strike out should be sustained.

2. ———: RES ADJUDICATA: VOID ORDINANCE. A suit founded on the validity of two city ordinances, which have previously been held by this court to be *ultra vires* of the city, and void, can not be maintained by the parties to said suit or their privies, the former suit being conclusive upon such persons.

145 551
85a 666
145 551
d161 385
145 551
f 88a 312
145 551
169 350
145 551
177 4604
e102a 6100

3. ———: ———: ———: BUT SAME PARTIES. The action must, however, be between the same parties as those in the former suit, or their privies.

4. ———: ———: ———: PARTIES AND PRIVIES DEFINED. Parties are all persons having a right to control the proceedings, to make defense, to adduce or examine witnesses, and to appeal from the decision if an appeal lies. Privies are those who have mutual or successive relationship to the same right of property or subject matter, such as personal representatives, heirs, devisees, legatees, assignees, voluntary grantees, or judgment creditors or purchasers from them with notice of the fact.

5. Contracts: CITY ORDINANCES: EFFECT OF REPUDIATING ORDINANCE. Where a city enters into a valid contract by an ordinance, which allots to a private corporation particular subway spaces on its streets for laying its telephone and telegraph wires, it can not invalidate or impair that contract by a subsequent ordinance repudiating it and allotting the same space to another company.

6. Telephone and Telegraph Companies: RIGHT TO CONSTRUCT UNDERGROUND CONDUITS. Telegraph and telephone companies, under the Missouri statutes, have the right to occupy the streets of St. Louis in constructing their lines of wire, and, with the consent of the city, to lay such wires under ground. And that city has the power to permit such companies to construct such underground conduits, and to enter into contract with them specifying the conditions upon which its consent to such construction is given.

7. ———: ———: PROPRIETARY OR BUSINESS CAPACITY. The city in granting to a company the right to lay its wires and construct its underground conduits, acts in its *proprietary* capacity, and in pursuance of the powers conferred upon it by its charter.

8. ———: ———: POWER TO LEASE TO OTHER COMPANIES. The statutes of Missouri authorize one such subway company to charge another rent for the use of any part of its way or facilities.

9. ———: ———: ———: TOLLS. The right to charge such companies tolls, or to make an agreement with other companies for the use of its subway, are franchise rights, derived from the State alone, and with which the city has no concern.

10. ———: ———: COMMON CARRIER: PUBLIC USE. A telegraph company is not a common carrier, and the fact that the city ordinance declares a telephone and telegraph company a common carrier, does not make it such. It is the nature of the company's business which determines its character. But the use of the streets of the city by such company is a public use, and while not a common carrier it is in some respects similar to one; the city may by ordinance require it to permit other companies engaged in a similar business to lay

State ex rel. Subway Co. v. St. Louis.

their wires in its subway; on the other hand, such companies are public corporations, having the right to condemn property for public use. (Overruling *State ex rel. v. Murphy*, 134 Mo. 548).

11. **Mandamus**: WHEN AWARDED. Where a telephone company has a clear legal right to the relief sought at the hands of a city, and no specific legal remedy therefor, a peremptory writ of *mandamus* will issue.

12. ———: ———: SPECIAL CASE. Such company, when such right exists, may proceed by *mandamus* to compel the city of St. Louis and its board of public improvements, to take action upon plans and specifications submitted by the company for service and supply pipes connecting manholes in the subway, constructed by virtue of the terms of certain ordinances, with the area way under the buildings and sidewalks, and for a permit to do such work.

## *Mandamus.*

PEREMPTORY WRIT AWARDED.

*Boyle, Priest & Lehmann, S. H. King* and *James M. Lewis* for relators.

The questions presented for decision in this suit are quite simple. They are the following: (1) Has the city of St. Louis given its consent or permission to the National Subway Company of Missouri, its successors or assigns, to exercise the franchise granted to it by the State? (2) If it has done so, can the city, under any state of facts, or as set forth in this suit, revoke its consent, and, as expressed by counsel for respondents in the former *mandamus* suit, the contract being executory, in so much as the relator has only been acting under its "franchise" for about seven years, is it the duty of the city to disaffirm and annul it? R. S. 1889, secs. 2721, 2793, 1764, 1890, 2722, 2727, 2728, 2729, 2730; *New York v. Squire*, 145 U. S. 189; *New Orleans Waterworks Co. v. La. Sugar Co.*, 125 U. S. 32; *Day v. Green*, 4 Cush. (Mass.) 438; *Indianapolis v. Gas Light Co.*, 66 Ind. 396; *Moore v. Cape*

*Girardeau*, 103 Mo. 475; *Syracuse Water Co. v. Syracuse*, 116 N. Y. 181; *Lombard v. Stearne*, 4 Cush. (Mass.) 60; Morivitz on Pr. Corp., 1129. (3) The suit of the St. Louis Underground Service Company, a company organized under the manufacturing act, against Michal J. Murphy, street commissioner, is not *res adjudicata*. *State ex rel. v. Burkhardt*, 59 Mo. 75; *Enfield v. Jordan*, 119 U. S. 687. (4) The ordinances are not franchises. *New York v. Squire*, 145 U. S. 182; *New Orleans Waterworks Co. v. La. Sugar Co.*, 125 U. S. 32; *Detroit v. Railroad*, 56 Fed. Rep. 881; *People v. Mutual Gas Light Co.*, 38 Mich. 154; *People v. Ferry Co.*, 92 Mich. 522; *National Foundry & Pipe Works v. Oconte Water Co.*, 52 Fed. Rep. 29; *Africa v. Knoxville Co.*, 70 Fed. Rep. 733; *Railroad v. People ex rel.*, 73 Ill. 547; *Mayburg v. Mutual Gas Co.*, 38 Mich. 155; *Railroad v. Mamow*, 87 Tenn. 409; *State ex rel. v. Railroad*, 85 Mo. 282; *Hovelman v. Railroad*, 79 Mo. 628; *People v. O'Brien*, 111 N. Y. 1; *U. S. v. Railroad*, 160 U. S. 50. (4) This "grant" or "consent" can not be revoked or repealed. In the case of *Africa v. Knoxville*, 70 Fed. Rep. p. 733, Court says: "City has no power 'delegated' to it, to repeal this grant." That it can not revoke this "consent" is decided by the following cases: *Marsh v. Lowery*, 37 Mich. 26; *Railroad v. Baldwin*, 37 Leg. Int. (Pa.) 434.

*B. Schnurmacher* and *Chas. Claflin Allen* for respondents.

(1) The court ought not to permit the amended information to be filed, nor issue any amended writ thereon. (*a*) Amendments are matters of discretion with the court. *Ensworth v. Barton*, 67 Mo. 622; *Chauvin v. Lownes*, 23 Mo. 223; R. S. 1889, secs. 2098 and 2117; *Lumpkin v. Collier*, 69 Mo. 170. (*b*) The alter-

VOL. 145, APRIL TERM, 1898.     555

State ex rel. Subway Co. v. St. Louis.

native writ of *mandamus* is a writ issued by the court.
R. S. 1889, sec. 6811; *State ex rel. v. Lewis*, 76 Mo. 370.
Therefore it ought not to be issued unadvisedly by the
court, or on information containing improper or irrel-
evant or redundant matter, or matter which, if rele-
vant, would change the cause of action. (*c*) The ordi-
nance was not passed till after the final decision of this
court, sitting *in banc*, in *State ex rel. St. Louis Under-
ground Service Co. v. Murphy*, 134 Mo. 548, which
declared the ordinances 14798 and 15953 void, and
therefore decided that there was no contract between
the city of St. Louis and the relators. *N. O. Waterworks
Co. v. La. Sugar Co.*, 125 U. S. 18; *Hamilton Gas-
light Co. v. Hamilton*, 146 U. S. 266; *DeSaussure v.
Gaillard*, 127 U. S. 233; *Klinger v. Missouri*, 13 Wall
263; *Brown v. Atwell*, 92 U. S. 327; *Bank v. Board of
Liquidation*, 98 U. S. 140; *Chouteau v. Gibson*, 111 U. S.
200; *Adams Co. v. Railroad*, 112 U. S. 133. (2) This
case is *res adjudicata*. *Chouteau v. Gibson*, 76 Mo. 47;
Cooley's Const. Lim. 47; 2 Taylor's Evid., sec. 1513;
*Chouteau v. Gibson*, 111 U. S. 200; *Preston v. Ricketts*,
91 Mo. 320; *St. Louis v. Lumber Co.*, 98 Mo. 613;
*Sampson v. Mitchell*, 125 U. S. 217; Chand on Res
Judicata, p. 156; *Forsyth v. Hammond*, 17 U. S. S. C.
Rep. 670; *Cromwell v. Co. of Sac.*, 94 U. S. 351; *Lum-
ber Co. v. Buchtel*, 101 U. S. 638; *Stout v. Lye*, 103
U. S. 66; *Nesbit v. Independent Dist.*, 144 U. S. 610;
*Railroad v. Horton*, 152 U. S. 252; *Last Chance Min.
Co. v. Tyler Min. Co.*, 157 U. S. 683. The doctrine of
*res judicata* applies to *mandamus* proceedings as fully
as to any other form of action. Merrill on *Mandamus*,
sec. 315; *State ex rel. v. Trammel*, 106 Mo. 510.

BURGESS, J.—This is a proceeding by *mandamus*
to compel the city of St. Louis, and its board of pub-
lic improvements, and the members of the board,

viz.: Robert E. McMath, president of said board, and M. L. Holman, water commissioner; Branch H. Colby, sewer commissioner; Franklin L. Ridgely, park commissioner; Charles H. Stone, harbor commissioner and A. N. Milner, street commissioner, to take action upon plans and specifications submitted by relators to said board on February 19, 1897, "for service and supply pipes connecting manholes in the subway constructed by virtue of the terms of ordinances numbered 14798 and 15953, located at the southwest corner of Broadway and Olive street, with the area way under the building and sidewalk located at said southwest corner of Broadway and Olive street," and for a permit to do the work contemplated by the application.

The original information or petition for the writ was filed May 24, 1897, and on the same day an alternative writ of *mandamus* was duly issued by order of this court, directed to the respondents, made returnable June 8, 1897. The writ was duly served, and on the day that it was made returnable, to wit, June 8, 1897, respondents filed their return thereto. Thereafter on the —— day of ——, 1897, relators were granted leave to file an amended information upon which an amended alternative writ of *mandamus* was issued ——, 1897.

The alternative writ of *mandamus* was amended by inserting the following averments:

*Twelfth.* Your petitioner would further show unto this honorable court, that subsequent to the passage of the ordinances hereinbefore named, the defendant, the city of St. Louis, through its legislative authorities, passed another ordinance, known as the "Keyes" Conduit Bill (a copy of which is hereto attached and made a part hereof), under and by virtue of which certain streets and particular parts thereof, previously assigned to the National Subway Company of Missouri, its successors and assigns, have since been assigned to and

appropriated by other wire-using companies, namely, the Bell Telephone Company of Missouri, the Kinloch Telephone Company, which companies do not occupy exclusively with their subway works the particular spaces first allotted to your petitioner, and to its detriment and injury, in that it (your petitioner) is thus prevented from fulfilling and carrying out its contract obligations with the Postal Telegraph-Cable Company assumed in good faith, based on the specific assignment of street space, previously made by the proper authorities of the city of St. Louis for the use of your petitioner (The National Subway Company of Missouri, its successors and assigns). Your petitioner would further show unto this honorable court, that under and by virtue of the ordinances hereinbefore named, and the acceptance of the conditions thereof by your petitioner, and a full and complete compliance with its terms, and the continued exercise of the privileges conveyed thereunder, involving the expenditure of large sums of money, all of which acts and expenditures it will be shown were done and made by and with the full consent of the proper municipal authorities, and under the careful and specific direction of the city of St. Louis, through its board of public improvements, your petitioner is solely and alone entitled to occupy the spaces in the streets, especially and originally assigned to it, according to maps and detailed plans and specifications filed with the city of St. Louis as a condition of the hereinbefore named ordinances, and which were duly approved by the board of public improvements in order that it (your petitioner) may carry on the work and perfect a comprehensive system of subway originally intended and designed, and of which system the part already laid at great expense by your petitioner previous to the interference of the defendant, must remain only a fragment, and utterly useless for the purposes,

intended on account of its incomplete condition. Your petitioner further shows unto this honorable court, that under and by virtue of the ordinances hereinbefore mentioned, on the one hand the compliance on the part of your petitioner with all the terms and conditions of the ordinances in question, and on the other a full and unrestricted exercise by the city of St. Louis, the defendant, of its rights and duties thereunder, causing the expenditure in good faith of large sums of money by your petitioner, constitute an irrevocable contract, of which the ordinance known as the "Keyes" bill subsequently passed in an impairment in that, acting under its terms, the defendant has without due process of law, taken and appropriated the particular spaces in the streets originally allotted to your petitioner for its use under and by virtue of its said ordinances, and has given the spaces in the streets hereinbefore referred to, to other applicants for conduit space, retaining the right to do so under and by virtue of the aforesaid "Keyes" ordinance. Your petitioner is advised and so charges that under and by virtue of said ordinances numbered 14798 and 15953, a contract was entered into between your petitioners and the said defendant, the city of St. Louis, by virtue of which they possess a vested right to those parts of the streets of said city designated and set apart to your petitioners by said city of St. Louis under and by virtue of said ordinances, and to those which the city of St. Louis under the terms of the ordinance in question may subsequently substitute in lieu thereof. That by virtue of said "Keyes" ordinance, the ordinances numbers 14798 and 15953 have been virtually repealed, and the passage of said "Keyes" ordinance and the action taken by the city of St. Louis, under and by virtue of said ordinance as hereinbefore shown, is a violation of that provision of the Constitution of the United States

which prohibits "Any State from passing any law imparing the obligation of a contract." That the taking of this right of way, to which the city gave its consent as provided by law, to be used by your petitioners, for the uses and purposes contemplated by their charter, is a violation of that provision of the State Constitution and of the Constitution of the United States, which says that "no one shall be deprived of his life, liberty or property, except by due process of law."

"*Thirteenth.* And these relators would further respectfully show unto your Honor, that since the granting of the alternative writ herein, each of its co-relators herein have granted, bargained, sold, and assigned, transferred and conveyed each, every and all of their several and respective interests in the franchises, hereditaments, and property contained in and granted by said ordinance number 14789 and the amendment thereto and the subways constructed as aforesaid to your relator, the National Subway Company of Missouri."

Respondents made return to the amended writ on October 21, 1897, in which they allege that ordinances 14798 and 15953 are void and that relators nor any of them ever at any time acquired any rights thereunder. And for further return they allege that the same issues are involved, and that the parties to this proceeding are the same parties or their privies, who were parties to the suit of the *State ex rel. St. Louis Underground Service Company v. Murphy, Street Commissioner*, 134 Mo. 548, in which there was judgment adversely to relators, and plead the judgment rendered in that case as *res adjudicata* to this proceeding. They also deny that relators are entitled to the relief sought under the allegations in the amended writ notwithstanding they admit all material allegations in the original writ to be true except as hereinbefore indicated.

On the same day of the return, to wit, October 12, 1897, respondents filed their motion to strike the amended information for an alternative writ from the files, upon the ground that the court abused its discretion in granting leave to amend the information, and that the matter inserted in the information by way of the amendment is irrelevant and redundant.

On October 12, 1897, relators filed their motion to make the alternative writ of *mandamus* theretofore issued peremptory, notwithstanding the return of respondents to the amended writ, for the following reasons:

*First.* For that said return does not state facts sufficient to excuse the said respondents from performing the duties enjoined by said alternative writ.

*Second.* For that said return is insufficient.

*Third.* For that upon the facts admitted in and by said return a peremptory writ should be awarded.

The National Subway Company of Missouri is a corporation duly incorporated and organized as such under and in accordance with the provisions of Chapter 42, article V, of the Revised States of Missouri, on the twenty-eighth day of January, 1889, for the purpose of acquiring, operating and maintaining a line of underground magnetic telegraph in the city of St. Louis, Missouri, and to lay out, construct and maintain the necessary conduits, subways, ducts and other necessary appurtenances for operating said underground magnetic telegraph, to be connected therewith.

By section 2721 of said article it is provided that companies organized thereunder are authorized to set their wires and other fixtures along, across or under any of the public roads, streets and waters of this State, *provided* any company desiring to place its wires and other fixtures under ground in any city shall

first obtain consent of such city through its municipal authorities.

Section 2724 of said article provides that any company so organized may construct, own, use and maintain any line of telegraph or telephone whether wholly within or wholly or partly beyond the limits of this State, and shall have power to lead or attach to the lines of such company other lines by lease or purchase, and may join with any other corporation or association in constructing, leasing, owning, using, or maintaining their line or lines upon such terms as may be agreed upon, and may own any interest in such line or lines, or may become lessees thereof upon such terms as the respective corporations may agree upon.

The National Subway Company then applied to the municipal authorities of the city of St. Louis for "consent" to place its wires under the surface of the streets, as required by section 2721, *supra*, and the city by its municipal assembly by the enactment of ordinance number 14798, gave the desired consent. The ordinance is composed of ten sections and as stated by relator is as follows:

"Section 1 grants to the National Subway Company, its successors and assigns, for a period of thirty-five years, ·permission to construct and operate conduits, etc., in any of the public highways for the purpose of distributing and maintaining a line or lines of wires for the transmission of electricity for any and all purposes, upon condition that it submit to and secure the approval of the board of public improvements, detailed drawings and plans of the work proposed to be done before doing it.

"Section 2 prescribes the manner in which the main conduit shall be laid, and as follows: (1) When in the streets and avenues on a line parallel with the

curb and three feet distant therefrom and at a depth of at least two feet below the surface. (2) When placed in the alleys, to be laid upon a line to be designated by the board of public improvements. (3) When put under the sidewalks, to be laid between the curb and a parallel line and about five feet from the curb and subject to the approval of the board of public improvements.

"Section 3 provides that the work shall be done with the least possible delay and inconvenience to the public, and that the surface of the streets shall be restored to their condition before interruption and so maintained for a period of twelve months.

"It also provides that if at any time the improvement, repairs or the lowering of the grade of any street or alley, the laying of water pipe, construction of sewers or of any other public work should require the taking up or removing or relaying of any pipes or appurtenances, such work shall be done by the grantee at its own cost.

"Section 4 requires a deposit of $1,000 to be made and maintained to be used by the street commissioner in doing such work as the grantee being required to do, shall have failed to do; and provides in addition for penalty.

"Section 5 provides that the grantee shall be a common carrier, shall permit any person or company to use its system or underground conduits upon such terms as they may agree upon; and in the event of a disagreement, the price shall be fixed by arbitrators and specifies the manner of their appointment.

"Section 6 provides in addition to all other taxes the grantee shall provide space in its subway for the fire, police alarm and telephone wires of the city free of charge and to furnish the wire.

"Section 7 makes the grantee subject to the provisions of all ordinances then in force or thereafter enacted relating to excavations in streets, alleys, etc.

"Section 8 provides for a bond of $25,000 to the city, and under what circumstances a new one may be required. It also provides that unless the work of laying its conduits shall be begun within six months that the ordinance shall be void.

"Section 9 provides that this ordinance shall not be construed as an exclusive franchise and that any breach of its conditions shall cause a forfeiture.

"Section 10 provides the terms and ·conditions upon which the city may acquire the system of conduits."

On February 15, 1889, the city of St. Louis through its Municipal Assembly passed an amendment to the foregoing ordinance which is styled in these proceedings ordinance number 15953. This amendatory ordinance repeals sections 6 and 10 of the original ordinance and amends sections 1, 4 and 5. This ordinance eliminates sections 6 and 10 of ordinance 14798 and substitute for sections 1, 4 and 5, three other sections.

No material change is made in section 1 by the amendment except to extend the duration of the franchise to fifty years and to grant the right to distribute and maintain electric, telegraph, and other wires. No change of any consequence was made in section 4.

By section 5, as amended, said company and its successors and assigns are declared to be a common carrier and are required to pay to the city for the rights and franchises granted the sum of $500 semiannually in advance. No provision is made for the use of the wires by the city, or the right of any other company or person to use them.

Under the circumstances stated relators builded under the surface of certain streets in the city of St.

Louis, a subway containing ducts wherein to place their wires employed in carrying electric currents for telephonic, telegraphic, light and heating purposes. These ducts serve the same purpose as poles erected upon the surface of the streets, and alleys. In order that they may be accessible and afford electrical accomodations to buildings along the route of the tunnel it is necessary to construct manholes, and in this way unite the buildings with it by means of lateral ducts.

On February 19, 1897, relators applied to the board of public improvements of St. Louis, which have general and special jurisdiction of that matter for the approval of plans and specifications then and therewith submitted "for service and supply pipes connecting manholes in the subway constructed by virtue of the terms of said ordinances (numbers 14798 and 15953) located at the southwest corner of Broadway and Olive street with the area way under the building and sidewalk located at said southwest corner of Broadway and Olive street," and for a permit to do the work contemplated by the application.

The board refused to consider or pass upon or take any official action in respect of the application, and hence this petition for a *mandamus* to compel it to consider and pass upon the matter. Relator charges that if it is not permitted to connect its wires by tunnel in the streets, with buildings, its subway will be absolutely useless.

The subway as constructed was built under the direction and with the approval of the board of public improvements and at an outlay of over $150,000, and the city collected semiannually from the National Subway Company and its successors the $500 stipulated to be paid in section 5 of the original ordinance as amended and the $1,000 required to be maintained by section 4, and now holds or has enjoyed the benefit of

those sums. The city has received from these respondents and now holds, $6,000 or $7,000 as a compensation or tribute for the privilege granted by these ordinances. It is further conceded that the subways already constructed have been and are now being used by the Postal Telegraph Company (a telegraph company) for the housing and operation of its wires under a contract between it and the relators. Since the pleadings were made up the case has been dismissed as to the city of St. Louis.

I. Respondent's motion to strike out is aimed at paragraph twelve of the amended writ, and is predicated upon the ground that the matter therein contained is immaterial and redundant. It will be observed that the paragraph in question is with respect to the assignment by the city by another ordinance known as the "Keyes" Conduit Bill, under and by virtue of which certain streets and particular parts thereof, previously assigned to the National Subway Company of Missouri, its successors and assigns, it is alleged have since been appropriated by other wire using companies which are now occupying exclusively with their subway works the particular spaces first allotted to the relators, to their injury, thus presenting issues which are foreign to those presented by the original writ, and which are not we think, the subject of adjustment in a proceeding of this character. The matters alleged in that paragraph have no connection whatever with the failure of the city, and its board of public improvements to take action upon plans and specifications submitted by relators to said board at the time alleged. Therefore we think the motion should be sustained.

II. It is contended by respondents, and so alleged in their return to the alternative writ, that the case of the *State at the Relation of the Underground Service Company v. Murphy*, 134 Mo. 548, is an adjudication of the

invalidity of ordinances 14798 and 15953, and is conclusive upon all the parties to this controversy, and in this proceeding.

That case was a proceeding by *mandamus* by the Underground Service Company (a company organized under the provisions of chapter 42, article VIII, R. S. 1889, whose charter powers, as defined in its articles of association, were to "lay out and maintain, construct and operate lines of subway in this State for the purpose of carrying wires for the transmission of electricity and electric currents; also to lay out, construct, maintain and operate lines of pipes, mains and conductors in this State for the purpose of distributing substances, either for fuel or illuminating purposes, or for both," etc.) to compel Murphy, who was street commissioner, to grant to it a permit under section 568, article I, chapter 15, of the revised ordinances 1887, to excavate Broadway street, between St. Charles and Washington avenue. The relator had already procured the approval of the board of public improvements of its plans of constructing its subway along Broadway, as required by ordinance number 14798, and the amendment thereto. But after that a permit from the street commissioner was necessary under the provisions of section 568 of the revised ordinances, which reads as follows: "No person shall make or cause to be made any excavation on any public street, highway or alley, without the written permission of the street commissioner so to do." This permit the street commissioner refused to give, and it was to compel him to perform that duty, under the revised ordinances, that the *mandamus* proceedings above referred to were inaugurated.

It is contended by relators that ordinance number 14798, and its amendment were not directly in issue in that case, but in this contention we do not concur, as

it was expressly held in that case as we understand it, that ordinance 14798 and ordinance 15953 which was amendatory thereof were *ultra vires* of the city of St. Louis, and void.

In the case of *Henry v. Woods*, 77 Mo. 280, it is said: "The fundamental rule on this subject is, that a matter once adjudicated by a court of competent jurisdiction, may be invoked as an estoppel in any collateral suit, in any court of law or equity, or in admiralty, when the same parties or their privies, or one of the parties and the privy or privies of the other allege anything contradictory to it. And those who assume a right to control or actively participate in the trial or its management, though not formal parties, will be concluded. *Stoddard v. Thompson*, 31 Iowa, 80; *Strong v. Phoenix Ins. Co.*, 62 Mo. 289; *Wood v. Ensel*, 63 Mo. 193. The action, however, must be between the same parties as those in the former suit, or their privies. Parties are 'all persons having a right to control the proceedings, to make defense, to adduce or examine witnesses, and to appeal from the decision, if an appeal lies.' 1 Greenleaf Ev., sec. 535. Privies are those who have mutual or successive relationship to the same right of property or subject-matter, such as 'personal representatives, heirs, devisees, legatees, assignees, voluntary grantees, or judgment creditors or purchasers from them with notice of the fact.' " Greenleaf's Ev., sec. 189; Story's Eq., sec. 165; *Haley v. Bagley* 37 Mo. 364; *The State ex rel. v. Johnson*, 123 Mo. 43.

It is manifest that the parties to the two suits in question are not the same. Respondents were strangers to the first suit, and none of them were necessary parties thereto, or privy to any party to that suit. Nor does it appear that the respondents or any of them participated in the trial of that suit, or that

they were in any way connected with its management.

Our conclusion is that the judgment in that case is not *res judicata*.

III.    The next question presented by this record is as to whether or not ordinance number 14798 is a valid contract as between the city of St. Louis and the National Subway Company of Missouri.

Relator's contention is that the contract is a valid one, having been made in pursuance of the city charter, while respondents assert that the ordinance is *ultra vires* of the city, and the contract void.    It may be conceded that if the contract was a valid one when entered into by the enactment of that ordinance by the municipal assembly of the city of St. Louis, and its acceptance by the National Subway Company, it is valid now, unless forfeited in some way—for no legislation by the city since the contract was entered into could in any way affect the rights of the subway company as to the terms of the contract unless it consented thereto.

The National Subway Company of Missouri was organized under the provisions of article V, chapter 42, Revised Statutes 1889 of Missouri, entitled "Telegraph and Telephone Companies," for the purpose, as expressed in its charter, of constructing, owning, operating and maintaining a line of underground magnetic telegraph in the city of St. Louis, and to lay out, construct and maintain the necessary conduits, subways, ducts and other appurtenances thereof and connected therewith.

Section 2721 of the statute concerning telegraph and telephone companies, provides as follows: "Companies organized under the provisions of this article, for the purpose of constructing and maintaining telephone or magnetic telegraph lines, are authorized to

·set their poles, piers, abutments, wires and other fixtures along, across or under any of the public roads, streets and waters of this State, in such manner as not to incommode the public in the use of such roads, streets and waters; provided, any telegraph or telephone company desiring to place their wire and other fixtures underground in any city, shall first obtain consent from said city through the municipal authorities thereof.''

Section 2724 of the statute is as follows: "Any company incorporated as herein provided, may construct, own, use and maintain any line of telephone or magnetic telegraph, whether wholly within, or wholly or partly beyond, the limits of this State, and shall have power to lease or attach to the line or lines of such company, other telephone or telegraph lines by lease or purchase, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining their line or lines, upon such terms as may be agreed upon between the directors or managers of the respective corporations, and may own and hold any interest in such line or lines, or become lessees thereof, on such terms as the respective corporations may agree.''

It will be seen from these two sections that telegraph and telephone companies organized under the article of the statute of which they form a part, are given express powers to lay their wires under ground in any city, by first obtaining its consent through the municipal authorities thereof. This of course implies the power to lay them in a proper manner not inconsistent with the use of the streets as public thoroughfares, as well also as the power to lease its lines when laid to any other company, or to unite with any other company in constructing them.

But aside from the express powers thus conferred

upon such companies organized under these two sections of the statute, it was held in *Julia Building Association v. Bell Telephone Co.*, 88 Mo. 258, that the erection and maintenance of telephone poles on the street upon which wires are stretched, over which telephone messages are sent, is a proper use of the street. There can be no question as to the right of telegraph and telephone companies under their charters to occupy the streets of the city in constructing their lines of wires, and with the consent of the city to lay them under the ground. And that the city has the power to permit, and to enter into a contract with such companies by which they may be given the right to do so, and to grant its consent upon condition imposed, we think equally clear. The following authorities in effect so held.

In *St. Louis v. Western Union Telegraph Co.*, 149 U. S. 467, in speaking of the charter powers of the city of St. Louis over its streets, it is said: "In pursuance of these provisions of the Constitution, a charter was prepared and adopted, and is, therefore, the organic law, of the city of St. Louis, and the powers granted by it, so far as they are in harmony with the Constitution and laws of the State, and have not been set aside by an act of the General Assembly, are the powers vested in the city. And this charter is an organic act, so defined in the Constitution, and is to be construed as organic acts are construed. The city is, in a very just sense, an '*imperium in imperio*.' Its powers are self-appointed, and the reserved control existing in the General Assembly does not take away this peculiar feature of its charter . . . . . . . Obviously, the intent and scope of this charter are to vest in the city a very large control over public property and property devoted to public uses, within the territorial limits. It is given power to own and establish streets, to improve them as it sees fit, and

to regulate their use, paying for all this out of its own funds. The word 'regulate' is one of broad import. It is the word used in the federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance number 11604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used.''

In speaking of the same subject Judge Dillon says: ''Where, under the general statutes of a State, a railroad was forbidden to construct and operate its road upon the streets of an incorporated city, 'without the assent of the corporate authorities,' these are not limited to a simple granting or denial of the right of way, but may prescribe conditions on which they will give their assent, and if these are accepted by the railroad company they are binding upon the parties; and, accordingly, where the right of way along a street was granted by a city on condition that the company should build a depot in a certain part of a city and grade, rip-rap and pave the street it used, and the company agreed to accept it on these terms, it was held that it could not hold and enjoy the grant and not comply with the conditions on which it was made.'' Dillon on Mun. Corp. [4 Ed.], sec. 706.

So in *St. Louis v. Western Union Telegraph Co.*, 148 U. S. 102, it was said: ''Again, it is said that by ordinance number 11604 the city contracted with defendant to permit the erection of its poles in consideration of the right of the city to occupy and use the top cross-arm of any pole for its own telegraph purpose, free of charge; and in support of that proposition the case of *New Orleans v. Southern Telegraph and Telephone Co.*, 40 La.

Ann. 41, is cited. But in that case it appeared that the telephone company had set its poles and constructed its lines, under and by virtue of the grant made by the ordinance, and hence the conditions named therein were held part of the contract between the city and the telephone company, which the former was not at liberty to disregard."

The question then arises as to the nature of this power, whether governmental, public, or proprietary and private. It is said in *Illinois Trust & Savings Bank v. City*, 76 Fed. Rep. 282, that: "A city has two classes of powers—the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other, proprietary, quasi private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city, and of the city itself as a legal personality. In the exercise of the powers of the former class, it is governed by the rule here invoked. In their exercise, it is ruling its people, and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation. . . . . . . . In contracting for water works to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens."

In *City of Quincy v. Bull*, 106 Ill. 337, by an ordinance of that city, one Prince, was granted the

exclusive right to construct, maintain and operate waterworks in the city of Quincy for thirty years, and the exclusive right to sell water in the city for municipal and private purposes, and also the right to lay maines under the surface of the streets, and on a bill filed by Prince and others against the city and its chief of police, to restrain their interference with the laying of water pipes by the complainants in the streets of said city, the ordinance was sustained as a proper exercise of the proprietary right of the city.

It seems from these authorities, and from reason as well, that the city of St. Louis in granting to the Subway Company the right to lay its wires and construct its subway under the surface of the streets, acted in its proprietary capacity, and in pursuance of the powers conferred upon it by the provisions of its charter. And telegraph and telephone companies being authorized by section 2724, Revised Statutes 1889, to lease or attach to the line or lines of such company, or other telephone or telegraph lines by lease or purchase, and to join with any other corporation or association in constructing, leasing, owning, using or maintaining their lines upon such terms as may be agreed upon, clearly authorizes one company to charge another rent for the use of any part of its way or facilities.

In *Belcher Sugar Co. v. St. Louis Grain Co.*, 101 Mo. 205, it is said: "The powers granted to, and duties imposed upon, the elevator company of themselves show that the property of the company is clothed with, and has attached to it, a public trust. Just like a railroad or a steamboat; the property is private and it is operated for private gain, but the use is public. It is true the defendant is entitled to collect compensation for handling grain and other merchandise, and so may a railroad or steamboat establish rates and collect compensation for transporting persons and property. The wharf

itself is not absolutely free, for the city has the right to make reasonable wharf charges, and so may the defendant make reasonable charges when performing wharf duties. But, it is said, the city has no control over the charges which defendant may make. If this elevator company has, as we hold, engaged to execute a public trust, then it is subject to public regulations, and the State may prescribe regulations even as to the charges. *Munn v. Illinois*, 94 U. S. 113. Whether the State has delegated the power to the city to regulate charges is a matter of no consequence to the present inquiry. It is enough to know that the combined elevator and warehouse is erected and maintained to aid in carrying on business which has a public trust attached to it, and a business which may be properly conducted at and upon the wharf."

It must follow from what has been said that the city of St. Louis, having the control as it does over its streets, might for the purpose of meeting the necessities of electric-using companies set apart for them a part of its streets, upon such terms and conditions as it might reasonably impose, without in any way misappropriating the streets, or any part of them.

The right to charge tolls, or to make an agreement with other companies for the use of its subway, are franchise rights, derived from the State alone, and with which the city has no concern. *St. Louis v. Bell Telephone Co.*, 96 Mo. 623; *State ex rel. Kansas City v. East Fifth Street Ry. Co.*, 140 Mo. 539; Dillon on Mun. Corp. [4 Ed.], sec. 724.

There is no ground for saying that an act of a municipal corporation is void because it does not exercise powers which it did not possess.

Nor do we think the ordinance invalid, because it does not reserve to the city control over the works. It is held in *People ex rel. v. Squire*, 107 N. Y. 593, that the

right to exercise such powers is governmental, which can not be alienated and of which the city could not divest itself. Under this authority the right to regulate the construction of the subway, and its use by the city, could at any time be regulated by it under its governmental and police powers, notwithstanding no such power is reserved in the ordinances.

The next question presented is, does the fact of the failure of the ordinance to provide for, or hold the right of user by other companies, render it invalid? Section 5 of the original ordinance provides that the National Subway Company shall be a common carrier, shall permit any person or company to use its system of underground conduits upon such terms as they may agree upon; and that in the event of a disagreement, the price shall be fixed by arbitrators. As amended, said section provides that said company and its successors and assigns are declared to be a common carrier and are required to pay to the city for the rights, and franchises granted, the sum of $500 annually in advance. No provision is made for the use of the wires by the city, or the right of any other company or person to use them. "According to the generally accepted definition, a common carrier is one who undertakes, for hire or reward to transport from place to place the goods of those who choose to employ them." 6 Am. and Eng. Ency. of Law (2 Ed.) 237. The mere fact that the National Subway Company is declared by ordinance to be a 'common carrier' does not make it so. It is the nature of its business by which its character is to be determined.

Whatever may have been the law heretofore, it is now generally held that telegraph companies are not common carriers. 6 Am. and Eng. Ency. of Law [2 Ed.] 261 and authorities cited. See, also, *Reed v. Western Union Telegraph Co.*, 135 Mo. 661; in which

it is held that a telegraph company is *not* a common carrier. But it does not for that reason follow that the use of the National Subway Company is not a public one. The corporation is not a mere private one for personal gain only, but the business in which it is engaged is for the benefit of, and used for the benefit of the general public, and in which many companies are now engaged all over the United States, and elsewhere. The city may by the exercise of its governmental powers, by ordinance, require it to allow other companies engaged in a similar business to lay their wires in its subway. And while not a common carrier it is in some respects similar to one, in that messages are sent over wires in its conduit, instead of goods and personal property as by common carriers. No one will contend that telegraph and telephone companies are not public corporations, having the right to condemn property for public use (Lewis on Eminent Domain, sec. 160, 241), and even if they are private corporations engaged in public uses, and have power to condemn property for such purposes, as the National Subway Company was incorporated under the same statute, it logically follows, that it possessed the same powers. "A use having been decided to be public, property devoted to it is liable to the regulation and control of the legislative authorities as to the manner of such use, the rates to be charged, and in all respects necessary to protect the public against danger, injustice and oppression. Foote and Everett, on The Laws of Incorporated Companies, 189. Again the same author (p. 196) says: "If a use is public, it extends its charter over all property necessarily associated with it, and indispensably incident to such use."

For these considerations it logically follows that the use of the National Subway Company is a public

one.   It follows that *State ex rel. v. Murphy*, 134 Mo. 548, should be overruled.

IV.   The only remaining question is with respect to the remedy.

"To entitle a party to a writ of *mandamus* he must be dispossessed of a clear legal right to have exercised an office or a franchise, or to have a service performed by the party to whom he seeks to have the writ directed, and has no legal specific remedy to which he can resort to compel the performance of this duty." 14 Am. and Eng. Ency. of Law, 94 and 95, and authorities cited. From the foregoing observations it seems clear that the National Subway has a clear legal right to the relief sought, and no legal specific remedy therefor. We therefore order that a peremptory writ of *mandamus* issue directed to the board of public improvements of the city of St. Louis, and each of the respondents herein, commanding them to take action upon the application aforesaid, so addressed to them by the relator, The St. Louis Underground Service Company, on February 19, 1897, for a permit to construct service and supply pipes connecting the manhole in the subway constructed as aforesaid, at the southwest corner of Broadway and Olive street, with the area way under building and sidewalk located at said southwest corner of Broadway and Olive street in order to connect subway so constructed with the building located as aforesaid, provided the same be not injurious or harmful to the use of the public of said highway, and that said board of public improvements be commanded to grant such permits to the relators as may be necessary and not injurious to the public use of its highways, to connect the subway so constructed with the buildings along the streets adjoining those in which said subway has already been constructed.

GANTT, C. J., ROBINSON, WILLIAMS and BRACE, JJ., concur. SHERWOOD, J., expresses his views in a separate opinion. MARSHALL, J., not sitting.

SEPARATE OPINION.

SHERWOOD, J.—Under the provisions of article 5, chapter 42, Revised Statute 1889, of Missouri the National Subway Company of Missouri was organized. That chapter is entitled "Telegraph & Telephone Companies." As expressed in its charter this organization was affected for the purpose of constructing, owning, operating and maintaining a line of underground magnetic telegraph in the city of St. Louis, and to lay out, construct and maintain the necessary conduits, subway, ducts and other appurtenances thereof and connected therewith.

Section 2721 of the statute, Revised Statute 1889, concerning telegraph and telephone companies, provides as follows: "Companies organized under the provisions of this article, for the purpose of constructing and maintaining telephone or magnetic telegraph lines, are authorized to set their poles, piers, abutments, wires and other fixtures along, across, or under, any of the public roads, streets and waters of this State, in such manner as not to incommode the public in the use of such roads, streets and waters; provided, any telegraph or telephone company desiring to place their wires and other fixtures underground in any city, shall first obtain consent from said city through the municipal authorities thereof."

Section 2724 of the statute is as follows: "Any company incorporated as herein provided may construct, own, use and maintain any lines of telephone

or magnetic telegraph, whether wholly within, or wholly or partially beyond, the limits of this State, and shall have power to lease or attach to the line or lines of such company, other telephone or telegraph lines by lease or purchase, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining their line or lines upon such terms as may be agreed upon between the directors or managers of the respective corporations, and may own and hold any interest in such line or lines, or become lessees thereof, on such terms as the respective corporations may agree."

With the consent then of the city of St. Louis first had and obtained, the National Subway Company was empowered by the statutes already quoted, to lay its wires underground, which grant, according to a very familiar principle, carries with it as accompanying and inevitable incidents, the use of all the auxiliary means and modes necessary to make the principal grant effectual. For thus runs the maxim: *Quando lex aliquid concedit, concedere videtur et id, per quod devenitur ad illud.* 1 Kent Com. [14 Ed.] 464; *Parker v. Way*, 15 N. H. *loc. cit.* 51; *State v. Wilson*, 87 Tenn. *loc. cit.* 697; *Moulton v. Reid*, 54 Ala. *loc. cit.* 325; *Ex Parte Marmaduke*, 91 Mo. *loc. cit.* 262.

And it is proper to observe at this place that the principle of the maxim quoted also finds further application and in a similar way, to wit, that inasmuch as the statutory charter of the National Subway Company empowered that company to lay its wires underground upon obtaining consent of the city so to do, such authority carries with it power to the city to grant to the company that which the statute authorizes the latter to ask for.

Such consent of the city has been obtained and is embodied in ordinance 14798, approved February 15,

1889, entitled "An act to provide for the laying of electric wires underground," and is contained in ten sections as follows:

Section 1 grants to the National Subway Company, its successors and assigns, for a period of thirty-five years, permission to construct and operate conduits, etc., in any of the public highways for the purpose of distributing and maintaining a line or lines of wires for the transmission of electricity for any and all purposes, upon condition that it submit to and secure the approval of the board of public improvements, detailed drawings and plans of the work proposed to be done before doing it.

Section 2 prescribes the manner in which the main conduit shall be laid and as follows: (1) When in the streets and avenues, on a line parallel with the curb and three feet distant therefrom and at a depth of at least two feet below the surface. (2) When placed in the alleys to be laid on a line to be designated by the board of public improvements. (3) When put under the sidewalks, to be laid between the curb and a parallel line and about five feet from the curb and subject to the approval of the board of public improvements.

Section 3 provides that the work shall be done with the least possible delay and inconvenience to the public, and that the surface of the streets shall be restored to their condition before interruption and so maintained for a period of twelve months. It also provides that "if at any time the improvement, repairs or the lowering of the grade of any street or alley, or the laying of the water pipe, construction of sewers or of any other public work shall require the taking up or removing or relaying of any pipe or appurtenances" that such work shall be done by the grantee at its own cost.

Section 4 requires a deposit of $1,000 to be made and maintained to be used by the street commissioner in doing such work as the grantee being required to do, shall have failed to do; and provides in addition for penalty.

Section 5. This is an important section. It seems to have had in mind the provisions of section 2724 Revised Statutes 1889, *supra*, as well as the idea of conserving the sub-surface space of the streets, a then very important consideration, and with the passing of days growing more prodigiously important. It declares: (1) The grantee shall be a common carrier; (2) and shall permit any person or company to use the system of underground conduits upon such terms as they may agree upon; and (3) in the event of a disagreement, the price shall be fixed by arbitrators and specifies the manner of their appointment.

Section 6 provides in addition to all other taxes the grantee shall provide space in its subway for the fire, police alarm and telephone wires of the city free of charge, and to furnish the wires.

Section 7 makes the grantee subject to the provisions of all ordinances then in force or thereafter enacted relating to excavations in streets, alleys, etc.

Section 8 provides for a bond of $25,000 to the city and under what circumstances a new one may be required. It also provides that unless the work of laying its conduits shall be begun within six months that the ordinance shall be void.

Section 9 provides that this ordinance shall not be construed as an exclusive franchise and that any breach of its conditions shall cause a forfeiture.

Section 10 provides the terms and conditions upon which the city may acquire the system of conduits.

On February 15, 1889, the city of St. Louis through its municipal assembly passed an amendment to the foregoing ordinance which is styled in these proceedings ordinance number 15953, which ordinance is entitled as the original one. This amendatory ordinance repeals sections 6 and 10 of the original ordinance and amends section 1, 4 and 5, and contains three sections, 1, 4 and 5.

Section 1. As so amended, is the same as section 1 of ordinance 14798, except as to the duration of the franchise, and provides that the franchise shall continue during the period of fifty consecutive years from February 15, 1889.

Section 4 provides that "to insure the faithful compliance with section 3 of this ordinance" said company shall be required to pay into the city treasury within ten days the sum of $1,000, as special fund to be used by the street commissioner for making repairs and changes in the pavements of the streets which have been removed by the company and not replaced by it, etc.

Section 5 is as follows: "Such corporation (or its successors or assigns), shall be a common carrier and shall have and enjoy such rights, privileges and immunities as are usually had and enjoyed by such companies, and shall pay to the city of St. Louis for the above rights and franchise, semiannually in advance, the sum of $500, commencing on the day this ordinance is approved."

By virtue of its charter and of the franchises mentioned being granted, the right thus became vested in the National Subway Company, its successors and assigns, to construct, maintain and operate conduits, pipes, mains, conductors, manholes and service and supply pipes in any of the streets, alleys, squares, avenues and public places of the city of St. Louis for

VOL. 145, APRIL TERM, 1898.    583

State ex rel. Subway Co. v. St. Louis.

fifty years from February 15, 1889, for the purpose of distributing and maintaining a line or lines of electric, telegraph, telephone and other wires, together with all necessary outlets and service wires or other electrical conductors to be used for the transmission of electricity for any and all purposes.

The word "under" in section 2721, *supra*, and the proviso quoted, was an amendment to section 879, Revised Statutes 1879, and first appears in the former section in the Revision of 1889. Such amendment had the effect of harmonizing the State law with the charter of the city of St. Louis; that charter, adopted in 1876 (pursuant to authority conferred by our organic law), in clause 2 of section 26, article 3, declares: "The mayor and assembly shall have power by ordinance to establish, open, vacate, alter, widen, extend, pave, or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves, and public grounds and squares, and provide for the payment of the costs and expenses thereof in the manner in this charter prescribed; and also to provide for grading, lighting, cleaning, and repairing the same, and to condemn private property for public uses, as provided for in this charter; to construct, and keep in repair all bridges, streets, etc., and to regulate the use thereof."

In such circumstances it must be deemed that the consent of the city of St. Louis to the National Subway Company placing its wires and fixtures under any of the streets of the city has been obtained by a complete compliance with the charter of the city and with section 2721, *supra*. And the National Subway Company which, since the issuance of the original writ herein, has acquired all the interests of its co-relators, is empowered; under the provisions of section 2724 aforesaid, as well as under the provisions of section 5 of ordinance 15953, which made that company a *common carrier*,

with all the rights, etc., usual to such companies, and in consequence thereof the conclusion can not be avoided, that such company has the right to use its conduits and wires for its own purposes, and may likewise lease, or attach to its line or lines other telegraph or telephone wires, etc., etc. But being under the provisions of section 5 last aforesaid, a common carrier, and indeed also under the general and stringent provisions of article 5, chapter 42, such company would fall within the control of the courts in reference to the use of its conduits by other companies and the reasonable compensation to be paid therefor, unless a prior valid agreement should, on this point, preclude the invocation of judicial interference. Not only was the city expressly authorized by section 2721 to grant consent to the National Subway Company to place its wires, etc., under the municipal streets, but in addition thereto, under its charter provisions, already quoted, it had the power "to establish, open, vacate, alter, widen, extend, pave or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves and public grounds and squares, and to regulate the use thereof."

This word *"regulate"* is one of very comprehensive signification, and so it was regarded by Chief Justice MARSHALL when speaking of a similar provision in the Constitution of the United States conferring upon Congress the power "to regulate commerce with foreign nations." He there said: "It is the power to regulate, that is to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." *Gibbons v. Ogden*, 9 Wheat. *loc. cit.* 196.

To the charter, the organic law of the city,

similar observations are applicable. And did this grant of power to the city stand alone, it would, without more, confer ample authority on the city to grant the use of its streets in manner and form as done in the ordinances under consideration. The power of the city in this regard is *plenary*, and can not be gainsaid unless their customary meaning and effect be denied to plain words. See, also, *State ex rel. v. Thomas*, 102 Mo. 85; *State ex rel. v. Schweickardt*, 109 Mo. 496.

And the general charter granted power to regulate the use of its streets, is sufficiently comprehensive to authorize the city to pass all necessary ordinances for regulating their use, whether any reservation to that effect were made in the ordinance in question or not. Of course, nothing more is intended by these remarks than a reasonable exercise of the power by the charter granted. And this power the city could not abdicate if it would. In other words, and speaking in a general way, the power of the city would be substantially the same so far as *mere regulation* is concerned, as it was before the wires were removed from the poles and placed beneath the surface of the streets. Besides all that, section 7 of the original ordinance "makes the grantee subject to the provisions of all ordinances then in force or thereafter enacted relating to excavations in streets, alleys," etc., etc.

And I make no doubt that the city under the singularly broad powers already related, "to establish, open, widen, extend, pave, or otherwise improve, etc., all streets, etc. . . . . . . . to construct and keep in repair all bridges, streets," etc., would have all needful authority to *"improve"* to *"construct"* its streets, etc. by establishing a system of conduits of its own, and rent out portions thereof to companies requiring the transmission of electricity for useful or public purposes. No method to *"improve"* a street could, in a modern sense,

so readily conduce to that end as furnishing the streets with all convenient electrical appliances which have come to be necessities of our advanced civilization. If the city be the possessor of this power, there is no obstacle in the way of the delegation of such power by the city to the National Subway Company.

A question similar to the one in hand arose in Illinois. It was in regard to whether the city of Chicago, having the power to build a bridge across the Chicago river, could confer that power on a railroad company to build such bridge; it being insisted that inasmuch as such power was a public power, it could not be delegated by ordinance to a third person. Upon this question, the Supreme Court of Illinois passed in the case of *McCartney v. Railroad*, 112 Ill. 611, and in doing so quoted from the case of *Escanaba Co. v. Chicago*, 107 U. S. 678, in which the Supreme Court of the United States uses this language: "And nowhere could the power to control the bridges in that city (Chicago), their construction, form and strength, and the size of their draws and the manner and time of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty;" and the Supreme Court of Illinois added: "The State, itself, no doubt, might construct the bridge. It might, as the legislature has here done, vest the local government of the city with authority to build the bridge. But it is claimed that the authority is reposed only in the *city itself* to build bridges, and is a power incapable of being delegated by the city to another. We do not consider that there is any delegation of power in the case. The city, through the corporation, does build the bridge. It matters little by what hands the bridge is built, or who lets the contract for the construction. The essential thing is determining whether the public interest calls for a bridge, and where and

in what manner it shall be built—and this is done by the city authorities. We think the authorization by the city, as in this case, of the building of the bridge by a corporation, comes fairly within the power given the city to construct and keep in repair bridges, and to regulate the use thereof.''

In point of principle, no difference is observable between the case referred to and the one presented by this record. To all intents and purposes the National Subway Company is but *the fingers* of the city, endowed both by State and municipality with power and duties which the city could legitimately have retained and performed.

But it is asserted that the ordinances quoted are invalid upon a ground other than those heretofore indirectly indicated, in consequence of the defect in their respective titles. It is not necessary in order to the validity of law or ordinance, that the title of either should do more than indicate the subject in a general way, without descending into details. There is but one subject contained in the bills, to wit: ''An ordinance to provide for the laying of electric wires underground,'' and that is clearly expressed in their titles. All of the provisions of the respective ordinances are germane to the subject treated of in the title, and no more can be required.

In *State ex rel. v. Mead*, 71 Mo. 266, it was ruled under a constitutional requirement precisely like the charter provision of St. Louis in this regard, that the title of an act ''concerning popular elections'' was a sufficient compliance with constitutional provisions. See, also, *St. Louis v. Weitzel*, 130 Mo. *loc. cit.* 614 *et seq.*, and cases cited; *State v. Bockstruck*, 136 Mo. *loc. cit.* 352 *et seq.* and cases cited.

The further reason is urged that the grant to the National Subway Company is ineffectual and invalid

because the franchises are not for a *public use*, but for the private use, gain and emolument of the National Subway Company. It is to be noted in this connection that section 2722 of article V authorized telegraph and telephone companies to enter upon lands, obtain a right of way and condemn lands in the manner provided by law. Such right of condemnation is reiterated in section 2734 of article VI. Such right of condemnation involving, as it does, and bringing into exercise the compelling-power of eminent domain, can be called forth by nothing less than *a public use*. This is elementary law. The existence of a public use is the touchstone and *experimentum crucis* of the right to invoke the aid of the power of eminent domain. *Venable v. Railroad*, 112 Mo. 103 and cases cited.

The State, by the sections cited and quoted, has given recognition to the use as being a public one, by the very fact of authorizing the occupancy and use of the streets and the condemnation of a right of way where necessary. This court on several occasions has directly ruled that the use of a street for the erection of telephone poles was not *a private* use. *Julia Building Ass'n v. Telephone Co.*, 88 Mo. 258; *St. Louis v. Bell Telephone Co.*, 96 Mo. 623.

There, the telephone company was organized under the law as it existed in 1879 (which is so far as concerns the present discussion subtantially as it exists at present), to erect and maintain telephone poles along and across public roads and streets, and the proper authorities of St. Louis permitted the company to erect and maintain its poles along such streets. And thereupon the ruling aforesaid was made that such company, though a private corporation, but carrying on the public service by the transmission of messages along its wires, should be permitted to use the streets for its poles.

The Supreme Court of the United States after commenting upon our rulings aforesaid, and upon the power of the city under its self-ordained charter to regulate the use of its streets, etc., held that in consequence thereof, the city had the right to contract with the telegraph company and to charge that company for the use of its poles which it had granted permission to be erected. *St. Louis v. Western Union Telegraph Co.*, 149 U. S. 465.

It must be obvious that the same considerations which apply to the use of streets for poles bearing wires *above*, must also apply where conduits for such wires are excavated *below* the surface of the streets. Any theory which would deny that the use of the wires in conduits under the surface of the streets as contemplated in the charter and franchises of the National Subway Company to be a public use, would with equal propriety condemn the Tunnel Company (which built its tunnel under the streets of St. Louis, and then leased its belongings, tracks, etc., to the Terminal Railroad Association of St. Louis which owns the engines that haul all the trains over the bridge owned by the Illinois and St. Louis Bridge Company through the tunnel and into the Union Station owned by the Union Depot Company of St. Louis), on the ground that the tunnel company was operating its tunnel merely for its own private gain, and not for a public use.   Surely the mere *size of the hole in the ground;* its depth below the surface of the street, whether it be called *tunnel* or *conduit,* or the purposes to which it is applied, whether it be the transportation of passengers or messages for hire, can not alter or in any manner change the nature of the use to which either method of transmission is applied.

Among other contentions of respondents the objection is taken that this proceeding is barred in conse-

quence of the adjudication by this court in the case of *State ex rel. St. Louis Underground Service Company v. Murphy*, 134 Mo. 548. The charter involved in that case was a different one from that involved in the present litigation, since there the charter was based on section 2793 of article 8, chapter 42, Revised Statutes 1889, the beginning words of which are these: "Any corporation formed under the provisions of *this article*." Besides, respondents admit that the National Subway Company was not a party to that litigation, nor was the officer of the city the same as in the proceeding now in hand, nor were his powers and duties the same, nor was the act the same, nor the property and location the same. For this reason it is that the principle of *transit in rem judicatam* does not apply. *Russell v. Place*, 94 U. S. 606; *Bissell v. Spring Valley*, 124 U. S. 225; *Nesbit v. Riverside*, 144 U. S. 610.

In the case at bar, relator, the National Subway Company, with the consent and affirmative action of the city's administrative officers, pursuant to a commission by its municipal assembly, has built, at a money cost of over $150,000, a mile and a half of subway, comprising about thirty miles of ducts, capable of, and adapted to, the accommodation and housing of wires used by electric light, heat and power-supplying companies, and telegraph and telephone companies; and a part of which, throughout the length of the subway, are now in use by the postal telegraph' company, under a contract between it and the former company.

And the ordinances mentioned, having been accepted and acted upon by the National Subway Company and work done thereunder as briefly outlined above, such acceptance, work and compliance with specified conditions constituted *a valid and unimpeachable contract* which could not be invalidated or over-

thrown except upon forfeiture judicially declared by some competent tribunal proceeding according to the course of the common law.   Touching the results attendant upon the acceptance and performance of such precedent conditions, it is said by BREWER, J., in *St. Louis v. Western Union Telegraph Company*, 148 U. S. *loc. cit.* 102–103: "Again, it is said that by ordinance number. 11604 the city contracted with defendant to permit the erection of these poles in consideration of the right of the city to occupy and use the top cross-arm of any pole for its own telegraph purposes, free of charge; and in support of that proposition the case of *New Orleans v. Southern Telephone & Telegraph Company*, 40 La. Ann. 41, is cited.   But in that case it appeared that the telephone company had set its poles and constructed its lines under and by virtue of the grant made by the ordinance, and hence the conditions named therein were held part of the contract between the city and the telephone company, which the former was not at liberty to disregard.   As stated in the opinion, page 45; 'Obviously, upon the clearest considerations of law and justice, the grant of authority to defendant when accepted and acted upon, became an irrevocable contract, and the city is powerless to set it aside or to interpolate new and more onerous considerations therein.   Such has been the well-recognized doctrine of the authorities since the *Dartmouth College* case, 4 Wheat. 518.'   The same principle controlled the cases of *Commonwealth v. New Bedford Bridge*, 2 Gray, 339; *Kansas City v. Corrigan,* 86 Mo. 67; *Chicago v. Sheldon*, 9 Wall. 50.''

In such circumstances, and under the foregoing authorities, the National Subway Company must be held to have done all that could be required at its hands in order to invoke judicial relief.

The ducts mentioned perform the same service as poles erected on the surface of the highways. To render them accessible and to give electrical accommodations to buildings along the route of the tunnel or conduit, it is necessary to construct manholes, and to unite the buildings with it by means of lateral ducts from them. On February 19, 1897, relators applied to the board of public improvements of St. Louis, which have general and special jurisdiction of that matter for the approval of plans and specifications then and therewith submitted "for service and supply pipes connecting manholes in the subway constructed by virtue of the terms of said ordinances (number 14798 and 15953) located at the southwest corner of Broadway and Olive street with the area way under the building and sidewalk located at said southwest corner of Broadway and Olive street,"—and for a permit to do the work contemplated by the application.

The board refused to consider or pass upon or take any official action in respect of the application and hence this petition for a *mandamus* to compel it to consider and pass upon the matter. Relators charge, what is physically manifest, that if not permitted to connect its wire tunnel in the streets with buildings, its subway will be absolutely useless.

The return of respondents when reduced from voluminous form to actual substance, consists of but two grounds of resistance to granting relief to relator, *first*, the ground of *res judicata*, and *second*, that the ordinances on which relator relies, are invalid. On the theory that the observations heretofore made are correct, these grounds are untenable. Proceeding upon the assumption of their correctness, the only question remaining for solution is whether relator is entitled to the relief it seeks.

The return of respondents being deemed invalid,

the alternative writ virtually remains unanswered, and stands confessed. The only redress this court can afford in this case is *legal* in its nature. The legal right of relator in the foregoing circumstances is clear, and equally clear is the plain legal duty of respondents to perform the act demanded at their hands.

It is true the issuance of the writ is, in some sense, discretionary, but this means a sound judicial discretion, not mere capricious or arbitrary refusal, on slight grounds or on grounds at all, to issue the writ. That writ in this country has long since ceased to be regarded as a high prerogative writ.

"It is to the public advantage that municipal corporations and their officers shall be made to perform the duties enjoined upon them by law, and the necessity which has been felt for affording easy remedies against them has led the legislatures and the courts in modern times to improve and liberalize the proceedings by *mandamus*, by relieving them of much of their former artificial and technical character. Accordingly 'it is,' says a high legal authority, 'well settled that a *mandamus* in modern practice is nothing more than an action at law between the parties, and is not now considered as a prerogative writ. The right of the writ, and the power to issue it, have ceased to depend on any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It is a writ to which every one is entitled, where it is the appropriate process for asserting the right he claims.' " 2 Dillion, Mun. Corp., sec. 825.

If relator could not obtain relief in this court by *mandamus*, it would result that relator could not, in this court, obtain any relief at all, because this court could not in an original proceeding like this afford any remedy except of a strictly legal character. It could

Vol. 145 mo—38

not grant an injunction (*Lane v. Charless*, 5 Mo. 285), and by the same token it could not grant the mandatory branch of that writ against anyone, although it seems such a writ may be issued by a court of first instance to compel a public officer to do his office by raising flush-boards in times of high water.    1 Spelling Extr. Rel'f., sec. 304.

And in the lower courts I have never noticed a precedent or read an authority which would sanction a resort in a case of this kind to a bill for specific performance.    Indeed, it has been decided that a court of equity will not enforce the specific performance of a contract to build a railroad. (2 Story Eq. Jur. [13 Ed.], p. 46 and cases cited.)    And by parity of reasoning it would seem that if a court of equity would deny specific performance in the case instanced, it would also refuse like relief where it is sought in order to compel a municipality or public officer thereof to allow a railroad or other similar structure contracted for to be built.    And it is very plain that if in cases like the present an action for damages should and could be brought against a recalcitrant municipality or officer, it would fall far short of affording adequate relief.    I state these things in order to show within what narrow lines relator would be cast could it not obtain in this court the specific and amply adequate relief which it seeks to obtain by the present method of procedure. It seems to me that every consideration of justice and adequacy of relief tends to support the conclusion that *mandamus* is the only remedy which will meet and rise to the exigencies of relator's situation.

And the principle which dominates this case has passed into precedent.    Thus in the *State ex rel. Bell Telephone Co. v. Flad et al.*, 23 Mo. App. 185, where the board of public improvements, after the telephone company had complied with all lawful requirements,

refused to issue a permit for the erection of poles on the streets, whereupon *mandamus* was awarded to compel the issuance of the permit.   See, also, High Extr. Leg. Rem., secs. 327, 332a, 333; 2 Dillon, Mun. Corp., secs. 832, 834.

Though *unrequested so to do*, I have not thought it altogether impertinent or improper thus to venture the expression of my crude, individual views on the chief points presented by this important record.  Speaking for myself, I am well satisfied that a peremptory writ should go compelling the board of public improvements to take action upon the application and plans filed, and in doing so conform to the requirements of the alternative writ.

And further, I am persuaded that the ruling in *State ex rel. v. Murphy*, 134 Mo. 548, upon which respondents rely, is erroneous and should no longer be followed.   WILLIAMS, J., agrees to the views herein expressed.