Wanamaker, J.
“The said company shall annually,-on the first Monday of January, pay to the said city of Columbus, for the benefit of the general expense fund of said city, ten per cent, of all moneys received from the sale of all natural gas sold at a price exceeding fifteen cents per thousand cubic feet * * * .”
This provision is taken from the franchise contract given by the city of Columbus in 1899 to The Federal Gas & Fuel Company.
Out of this provision arise two big questions raised by the plaintiff in error and decided adversely to it in the courts below.
The contention of plaintiff in error is that said provision has:
1. No legal effect because ultra vires.
2. If of legal effect, then such legal effect is limited to ten per cent, of the excess above fifteen cents per thousand cubic feet.
A return to and.review of some of the priipary principles of civil government, particularly municipal government, may help us in the proper determination of this case.
What is the origin of municipal power? What is the measure of municipal power? Did municipalities in Ohio, at the time of the grant, have the legal power to put such a provision in the franchise contract ?
*532 For more than half a century prior to 1912 it was the settled doctrine of Ohio, asserted by the general assembly, and unfortunately sanctioned by the courts, that municipalities in Ohio were merely the creatures of the law, creatures of the general assembly, and that they possessed no powers except such as were either expressly granted to them by the general assembly or such as were necessarily implied in order to carry into effect the powers expressly granted.
One of the leading cases in Ohio upon this doctrine of the origin of municipal power is that of Ravenna v. Pennsylvania Co., 45 Ohio St., 118. A part of the syllabus reads:
“Municipal corporations, in their public capacity, possess such powers and such only, as are expressly granted by statute, and such as may be implied as essential to carry into effect those which are expressly granted.”
In the course of the opinion, at page 121, this language appears:
“Such corporations, being created for convenience and economy in government, and to aid the state in legislation and administration of local affairs, are always subject, in their public capacity, to the control of the state.”
The same doctrine is announced in Markley v. Village of Mineral City, 58 Ohio St., 430. The following language is to be found at page 439 of the opinion:
“It is to be borne in mind that we are dealing with the status and capacity, not of a natural person, but of a corporate one, a mere creature of the *533 law, an artificial entity which, having no natural rights or powers, exists and operates only by virtue of the law of its creation.”
To the same effect is Townsend v. City of Circleville, 78 Ohio St., 122. The opinion by Judge Summers follows the same course of reasoning.
To the same effect is the case of the L. S. & M. S. Ry. Co. v. City of Elyria, 69 Ohio St., 415.
I want here and now to challenge the doctrine that municipalities have ever been mere creatures of the general assembly, and offer in support of the challenge part of the very able opinion of Judge Thurman in Cass v. Dillon, 2 Ohio St., 608. The last paragraph of the syllabus states not only an unquestioned historical fact, but a sound constitutional principle:
“The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed.”
The case arose under the Constitution of 1851 and continued to be the law of Ohio until the new Constitution of 1912.
Judge Thurman, in his very able opinion, supporting this proposition, says at page 622:
“The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law,until modified or repealed. Thus there is no ex *534 press provision that a county may make a road or contract a debt, yet no one will doubt for a moment that it may do both. Indeed, its power to contract debt is recognized, beyond even the authority conferred by law.”
It is well known that Judge Ranney also concurred in this view, though he dissented from other propositions in that case.
Judge Cooley in an early case, People, ex rel., v. Hurlbut, 24 Mich., 45, 97, 98, used very similar language with reference to the constitution of Michigan:
“First, that the constitution has been adopted in view of a system of local government well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, second, that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system. * * *
“The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the-management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people.”
The historical fact is that we had a hundred and more municipalities in Ohio already in existence at the time of the adoption of our first constitution, in 1802, which were many times multiplied at the time of the adoption of the second constitution, in 1851. *535 All were then exercising local self-government. The constitutional fathers did not even mention municipalities or cities in the first constitution, and in the second constitution granted to the general assembly certain power to restrict, from all of which it would seem a mere legal and constitutional axiom that the)'- never granted, nor intended to grant, to the general assembly of Ohio the general guardianship of all municipalities.
If all political power is inherent in the people, as written in our constitution, for the government of the state, it would seem at least of equal importance that all political power should be inherent in the people for the government of our cities and villages, and so it seemed to men like Thurman, Ranney, Cooley and Campbell, than whom there have been few greater in American jurisprudence. I prefer to follow their course of reasoning, based upon historical fact and political principles, rather than the mere dictums and dogmas of decisions holding that municipal government is government, by the general assembly.
As a corollary to this proposition of all political municipal power being in the general assembly of Ohio, the courts further crippled in a high degree its grants of power to municipalities by a super-strict construction of the grant.
The constitutional convention of 1912, in protest of that order, abolished by constitutional amendment general-assembly rule of municipalities, and sought to establish home rule. It is now for this court to correct the second evil, the superstrict construction of grant of power in matters that are *536 peculiarly within the right of local self-government. If it be Important that the world be made “safe for democracy” in the government of nations, it would seem at least of equal importance to the people of Ohio that our state shall be made safe for democracy in the government of our municipalities, for these constantly touch us in our everyday life.
The grant of power relied upon by the city of Columbus in its contentions in this case grows out of the following statutes —
Section 3714, General Code, which reads: “The council shall have the care, supervision, and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts, within the corporation, and shall cause them to be kept open, in repair, and free from nuisance.”
Section 3878, Revised Statutes, now Section 10129, General Code, pertinent parts of which read as follows: “The councils' of municipal corporations as to streets and alleys in their respective jurisdictions, subject to such regulation and restrictions as they prescribe, may grant to such companies [transporting gas], the right to lay such tubing, pipes, conduits, poles and wires therein.”
The city contends that under these sections of the statutes it is given full and final authority at least sufficient to legally contract in the language of the franchise above quoted.
The gas company, however, contends that this grant of power, by reason of it being “subject to such regulations and restrictions as they [the mu *537 nicipal council] prescribe,” effectually denies to the municipality the right to bind the gas company by such a provision, notwithstanding the gas company may have consented thereto and accepted the franchise, the gas company’s claim being that such a provision is ultra vires.
,, As before indicated in this opinion, the whole doctrine of the government of municipalities by general assemblies has no foundation in constitu-. tional fact or principle, so far as the same'is expressed therein. If it has any foundation at all it rests wholly in implication. But implied power is certainly not to be interpreted and applied when it is manifestly contrary to some express provision of the constitution.
Now, the Constitution of 1851, which was in full force at the time this franchise contract was entered into, contained this language, Article XIII, Section 6:
“The general assembly shall provide for the organization of cities, and incorporated villages, by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power.”
It would seem clear that this language measured to the full the restrictive power of the general assembly upon municipal government. The enumeration of these various restrictions is no more clear than the fact that restrictions upon other powers were thereby excluded. It is again the application of the old Latin maxim, as to which all courts are *538 agreed and always have been, expressio unius est exclusio alterius.
Examine these various powers mentioned in the constitution, which the legislature may restrict. What one of them is broad enough by any imaginative feat to include the restriction sought to be made upon the city in this case? These restrictions mentioned in the constitution were restrictions against burdens upon the people in the line of taxation, assessment and debt. None of them is broad enough to include benefits, credits, advantages, income and the like. And yet the contention made by the gas company is that the city had no power to receive any benefit, any profit, from the granting or operating of such franchise.
Again, note the fact that neither this constitutional provision nor any other part of the Constitution of 1851 sought to grant any power to the municipalities relating . to municipal finances or funds of a debit or credit nature. It was merely to restrict certain powers of debt, taxation and the like. Now it is evident you cannot restrict what has no existence, and, therefore, it follows that the constitutional convention, knowing the facts, recognized these powers as already existing in the corporation sufficient for self-government and merely provided that in certain respects the legislature “may restrict.”
The gas company admits that had Section 3878, Revised Statutes, used the words “subject to such terms and conditions as they [the council] prescribe” instead of “subject to such regulation and restrictions as they [the council] prescribe” the *539 franchise ordinance would be a valid contract and obligatory upon the company.
It must be conceded of course that the grant of power by the general assembly to the municipal government, through its council, was “to grant franchises to gas companies in its streets,” etc. Necessarily such grant of power must be in general terms, and such grant must be reasonably and liberally construed so as to effect the purposes of the statute. The legislature might well have used the language, “terms and conditions” instead of “regulation and restrictions.” If there be any substantial difference in latitude and longitude as to these terms, it would seem to be against the gas company rather than for it; for the language undoubtedly applies to. a limitation upon the powers and rights of the franchise company. Bear in mind that there is no qualifying word modifying the word “restriction.”
Now by what sort of reason, or want of it, can it be held that the word “restriction” can apply to the use and occupation of the streets and other public places, and the repair of them; but cannot apply to a restriction upon rates, upon profits, and cannot provide that when the rate shall exceed a stipulated sum a certain percentage thereof shall go to the municipality? If the village council is unlimited as to restrictions, how can it be claimed that they may not restrict in these respects ?
Much stress is laid in behalf of the plaintiff in error, the gas company, on what is known as the Zanesville case, reported in 64 Ohio St., 67. The fifth paragraph of the syllabus of that case reads:
*540 “A municipal corporation, though holding the title to its streets, has no private proprietary interest in them which éntitles it to compensation when they are subjected to an authorized additional public burden by the construction of a telephone line therein. But being charged with the duty of keeping the streets under its control in repair, it may be allowed compensation to an amount sufficient to make the repairs rendered necessary by such additional use. It is not essential that provision be made for the assessment of such compensation by a jury.”
The statute in that case was somewhat different from the statute in this case, but both statutes, so far as they are lawful enactments, were made under the same provisions of the constitution.
I deny that the municipality’s rights are limited to a charge for “repairs.” I deny a municipality “has no private proprietary interest in them [the streets] which entitles it to compensation when they are subjected to an authorized additional public burden by the construction of a telephone line therein.”
The municipality has a proprietary interest in the streets, a most important proprietary interest. It owns and holds them in trust for the people of the city, and acting as such trustee it is charged in its fiduciary relation with the highest measure of duty to safeguard the public interests to the people of the city. There is a great burden upon the city’s highways, great dangers to its people by reason of wires, poles and other structures, and if the city in any case be given the right to regulate *541 or restrict the use in the general terms of the statute, the compensation provided by ordinance for the benefit of the city is not thus to be limited to mere “repairs,” whether the ordinance be to a gas company, street railway company or any other public utility.
When a statute clearly confers a grant of power to do a certain thing, without placing any limitations as to the manner or means of doing it, certainly the grantee of such power is naturally and necessarily vested with a wide discretion to do such incidental things as are reasonably and manifestly in the grantee’s interests; particularly where that grantee is the public.
The same fundamental principle involved in this case was before this court in The Columbus Citizens Telephone Co. v. The City of Columbus, 88 Ohio St., 466, the syllabus of which is as follows:
“1. A municipality has the power to demand and receive from a telephone company, for the privilege of digging ditches and laying and maintaining subsurface conduits for telephone wires under its streets, compensation beyond what is necessary to restore the pavement to its former state of usefulness. (City of Columbus v. The Columbus Gas Co., 76 Ohio St., 309, approved and followed.)
“2. A stipulation in the ordinance granting the privilege, which requires the company to pay, among other considerations, a certain percentage of its gross annual receipts into the municipal treasury for the use of'the general expense fund, to which the company assented, though under pro *542 test, is not an assessment for general revenue in the nature of a tax.”
The same general doctrine has been held in other states. It is sufficient to enumerate Missouri, in State, ex rel. Subway Co., v. St. Louis, 145 Mo., 551; New Jersey, in Jersey City v. Jersey City & Bergen Co., 70 N. J. L., 360; Pennsylvania, Allegheny City v. Millville, E. & S. St. Ry. Co., 159 Pa. St., 411; Rhode Island, City of Providence v. Union Rd. Co., 12 R. I., 473; Illinois, Byrne v. Chicago General Ry. Co., 169 Ill., 75; South Dakota, City of Mitchell v. Dakota Central Telephone Co., 25 S. Dak., 409; and New York, City of Jamestown v. Home Telephone Co., 125 App. Div., 1. City of St. Louis v. Western Union Telegraph Co., 148 U. S., 92, and many other cases might be cited to the same effect.
After a very careful and thorough examination of this case and the legal principles involved, as well as of adjudications in other courts, we hold that the city of Columbus clearly had the power to contract with the gas company in the language of the franchise.
Now, to the second question. Upon what basis of the company’s receipts shall the ten per cent, be computed; on the whole receipts or only on the excess above the fifteen-cent rate?
The language of the franchise in the order in which it appears in the franchise may be subdivided as follows:
1. “The gas company shall pay”
2. “ten per cent.”
3. “of all moneys received”
*543 4. “from the sale of all natural gas”
5. “sold at a price exceeding fifteen cents per
thousand cubic feet.”
It is claimed there is doubt about the meaning of this language; that it is ambiguous upon the question as to whether or not the ten per cent, should be charged upon the whole amount received by the gas company from its consumers, or only upon the amount after deducting the amount received at the fifteen-cent rate. In short, the question Inade is, Shall the whole amount be the basis of computation, or only the excess above “fifteen cents per thousand?”
This court is presumed to know what is of common knowledge. It is a matter of common knowledge that at the head of the great public utilities of this state there are capable, clever men; that at their right hand are competent, shrewd attorneys; and that the ordinance in question was either drafted by these men and their counsel, or before the same was passed was carefully inspected by them, or, at least, that such inspection and critical examination were made before the ordinance was accepted by the gas company. It follows as a matter of course that had it been intended by the gas company to compute the ten per cent, only upon the excess, some appropriate words would have been used, or should have been used, to clearly express that purpose.
It is not the province of this court, however, to make a new contract for the parties. The contract is clear and convincing. This provision is remarkably free from all doubt. When the price exceeds *544 fifteen cents, then the ten per cent, is to be computed upon “all moneys received,” not upon part of the moneys received, or upon the moneys received in excess of the fifteen-cent rate.
Where there is no doubt there is no room for construction. Where there is no room for construction, there is no right of construction. The simplicity and straightforwardness of the language itself controls not only the parties but this court.
The judgment below is affirmed.

Judgment affirmed.

Nichols, C. J., Newman, Matthias and Johnson, JJ., concur.
Jones, J., concurs in first and second propositions of the syllabus.
Donahue, J., concurs in third proposition of the syllabus and in the judgment.